## DELLI PAOLI v. UNITED STATES.

No. 33.  Argued  October  18,  1956.—Decided  January  14,  1957.

*Daniel H. Greenberg* argued the cause and filed a brief for petitioner.

*J. F. Bishop* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Olney* and *Beatrice Rosenberg.*

Mr. Justice Burton delivered the opinion of the Court.

A joint trial in this case resulted in the conviction of five co-defendants on a federal charge of conspiring to deal unlawfully in alcohol. Only the petitioner, Orlando Delli Paoli, appealed. The principal issue is whether the trial court committed reversible error, as against petitioner, by admitting in evidence a confession of a co-defendant, made after the termination of the alleged conspiracy. The trial court declined to delete references to petitioner from the confession but stated clearly that the confession was to be considered only in determining the guilt of the confessor and not that of other defendants. For the reasons hereafter stated, we agree that, under the circumstances of this case, such a restricted admission of the confession did not constitute reversible error.

In the United States District Court for the Southern District of New York, the jury convicted petitioner and four co-defendants, Margiasso, Pierro, Whitley and King, of conspiring to possess and transport alcohol in unstamped containers and to evade payment of federal taxes on the alcohol.[1] The Government's witnesses testified that they had observed actions of the defendants which disclosed the procedure through which Margiasso, Pierro and petitioner supplied unstamped alcohol to their customers, such as King and Whitley. The Government also offered, for use against Whitley alone, his written confession made in the presence of a government agent and of his own counsel after the termination of the conspiracy.[2] The court postponed the introduction of Whit-

---

[1] In violation of 18 U. S. C. § 371, and I. R. C., 1939, §§ 2803 (a), 2806 (e), and 2913. Margiasso and King were also indicted and convicted for the substantive crime of possession of 19 5-gallon cans of unstamped alcohol, and Margiasso of another 113 of such cans.

[2] The confession appears as an appendix to the dissenting opinion below in 229 F. 2d, at 324–326. It is also printed as an appendix to this opinion, *post,* p. 243.

ley's confession until the close of the Government's case. At that time, the court admitted it with an emphatic warning that it was to be considered solely in determining the guilt of Whitley and not in determining the guilt of any other defendant. The court repeated this admonition in its charge to the jury.

The Court of Appeals affirmed petitioner's conviction, with one judge dissenting. 229 F. 2d 319. We granted certiorari especially to consider the admissibility of Whitley's post-conspiracy confession. 350 U. S. 992.

## I.

Petitioner first attacks the sufficiency of the evidence connecting him with the conspiracy. The Government's evidence, exclusive of Whitley's confession, showed that the defendants' conspiracy to deal in unstamped alcohol centered around a garage used for storage purposes in a residential district of the Bronx in New York City and a gasoline service station, also in the Bronx. The service station was used by Margiasso, Pierro and petitioner as a place to meet customers and transfer alcohol.

In December 1949, petitioner, using the alias of "Bobbie London," was associated with Margiasso and Pierro in inspecting the garage and in negotiating for its purchase. For $2,000 in cash, title to the garage and an adjacent cottage was taken in the name of Pierro's sister. In 1950, the garage was repaired, its windows boarded up and its doors strengthened and padlocked. Petitioner lived not far away, in the Bronx, and was observed, from time to time, at the garage or using a panel truck which was registered under a false name. During the daytime, this truck generally was parked near petitioner's home or the garage but neighbors testified that it was in use late at night. In it petitioner transported various articles to the garage or elsewhere. On one occasion, petitioner, with Margiasso, loaded it with bundles of cartons suited to

the packing of 5-gallon cans. Late in 1951, petitioner used an additional truck, also registered under a false name. In addition, he frequently drove to the service station in a Cadillac car. On December 18, 1951, he used this car in making delivery of a large package to a near-by bar.

During December 1951, the service station often was used as a meeting place for Margiasso, Pierro and petitioner. Margiasso and petitioner were there on the evening of December 28.[3] At about 7 and 10 p. m., respectively, King and Whitley arrived. Each turned over his car to Margiasso. Margiasso drove King's car to the garage and returned with it heavily loaded. King then drove it away. Government agents followed him until he stopped in Harlem. There they arrested him and took possession of 19 5-gallon cans of unstamped alcohol found in his car. Later in the evening, Margiasso took Whitley's car to the garage and was arrested in it when leaving the still open garage. The agents thereupon seized 113 5-gallon cans of unstamped alcohol they found in the garage. Whitley, who had been waiting for Margiasso at the service station with $1,000 in a paper bag, was arrested on the agents' return with Margiasso.

Petitioner's presence at the service station on the evening of December 28 was closely related to these events. He waited there with King for Margiasso to return with King's car containing the 19 cans of alcohol.

[3] On that occasion, the procedure followed closely the pattern observed by government agents on December 18 when, at 9 p. m., Margiasso and petitioner had been at the service station. A Pontiac car, with two occupants, drove up. The occupants got out. Margiasso drove away in their car and, half an hour later, returned with it heavily loaded. When the two men drove it away, government agents tried to follow it. However, they lost it in traffic and no arrests were made. The agents noted the car's license number, found it registered under a false name, and, on December 28, recognized it as the one in which Whitley then came to the service station.

He was there again with Margiasso at about 10 p. m. but left shortly before Whitley came. He returned while Margiasso, Whitley and the agents were there and was arrested while attempting to drive away.

Petitioner contends that the above evidence shows merely that he was a friend and associate of Pierro and Margiasso. We conclude, however, from the record as a whole, that the jury could find, beyond a reasonable doubt, that petitioner was associated with Pierro and Margiasso in the purchase of the garage and the use of the panel truck, that he knew that unstamped alcohol was stored in the garage, that he had access to it and that he was an active participant in the transfers of alcohol to Whitley and King. Accordingly, we agree with Circuit Judge Learned Hand's statement made for the court below, following his own summary of the evidence of petitioner's participation in the conspiracy:

> "Not only was all this enough to connect him with the business, but the jurors could hardly have failed to find that he was in the enterprise. The whole business was illegal and carried on surreptitiously; and the possibility that unless he were a party to the venture, Pierro and Margiasso would have associated [with] him to the extent we have mentioned is too remote for serious discussion." 229 F. 2d, at 320.[4]

II.

In considering the admissibility of the Whitley confession, we start with the premise that the other evidence against petitioner was sufficient to sustain his conviction.

---

[4] Participation in a criminal conspiracy may be shown by circumstantial as well as direct evidence. See, *e. g.*, *Blumenthal v. United States,* 332 U. S. 539, 557; *Glasser* v. *United States,* 315 U. S. 60, 80; *Direct Sales Co.* v. *United States,* 319 U. S. 703; *United States* v. *Manton,* 107 F. 2d 834, 839.

If Whitley's confession had included no reference to petitioner's participation in the conspiracy, its admission would not have been open to petitioner's objection. Similarly, if the trial court had deleted from the confession all references to petitioner's connection with the conspiracy, the admission of the remainder would not have been objectionable. The impracticality of such deletion was, however, agreed to by both the trial court and the entire court below and cannot well be controverted.

This Court long has held that a declaration made by one conspirator, in furtherance of a conspiracy and prior to its termination, may be used against the other conspirators. However, when such a declaration is made by a conspirator *after the termination of the conspiracy, it may be used only against the declarant and under appropriate instructions to the jury.*

> ". . . Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. *Clune* v. *United States,* 159 U. S. 590, 593. See *United States* v. *Gooding,* 12 Wheat. 460, 468–470. But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy. *Fiswick* v. *United States,* 329 U. S. 211, 217; *Logan* v. *United States,* 144 U. S. 263, 308–309. There can be no furtherance of a conspiracy that has ended. Therefore, the declarations of a conspirator do not bind the co-conspirator if made after the conspiracy has ended. That is the teaching of *Krulewitch* v. *United States, supra* [336 U. S. 440], and *Fiswick* v. *United States, supra.* Those cases dealt only with declarations of one conspirator after the conspiracy had ended. . . .

"Relevant declarations or admissions of a conspirator made in the absence of the co-conspirator, and not in furtherance of the conspiracy, may be admissible in a trial for conspiracy as against the declarant to prove the *declarant's* participation therein. The court must be careful at the time of the admission and by its instructions to make it clear that the evidence is limited as against the declarant only. Therefore, when the trial court admits against all of the conspirators a relevant declaration of one of the conspirators after the conspiracy has ended, without limiting it to the declarant, it violates the rule laid down in *Krulewitch.* Such declaration is inadmissible as to all but the declarant. . . .

". . . These declarations [*i. e.,* those admissible only as to the declarant] must be carefully and clearly limited by the court at the time of their admission and the jury instructed as to such declarations and the limitations put upon them. Even then, in most instances of a conspiracy trial of several persons together, the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose. While these difficulties have been pointed out in several cases, *e. g., Krulewitch* v. *United States, supra,* at 453 (concurring opinion); *Blumenthal* v. *United States,* 332 U. S. 539, 559–560; *Nash* v. *United States,* 54 F. 2d 1006, 1006–1007, the rule has nonetheless been applied. *Blumenthal* v. *United States, supra; Nash* v. *United States, supra; United States* v. *Gottfried,* 165 F. 2d 360, 367." *Lutwak* v. *United States,* 344 U. S. 604, 617–618, 619. See also, *Opper* v. *United States,* 348 U. S. 84, 95.

Petitioner contends that *Krulewitch* v. *United States,* 336 U. S. 440, requires the exclusion of a post-conspiracy confession of a co-conspirator. That case dealt with the scope of the co-conspirators' exception to the hearsay rule. This Court held that the utterance of a co-conspirator made after the termination of the conspiracy was inadmissible against other co-conspirators. Unlike the instant case, the declarant was not on trial and the question whether his utterance, implicating other alleged conspirators, could be admitted in a joint trial solely against the declarant, under proper limiting instructions, was neither presented nor decided.

The issue here is whether, under all the circumstances, the court's instructions to the jury provided petitioner with sufficient protection so that the admission of Whitley's confession, strictly limited to use against Whitley, constituted reversible error. The determination of this issue turns on whether the instructions were sufficiently clear and whether it was reasonably possible for the jury to follow them.[5]

When the confession was admitted in evidence, the trial court said:

> "The proof of the Government has now been completed except for the testimony of the witness Greenberg as to the alleged statement or affidavit of the defendant Whitley. This affidavit or admission will

---

[5] For long-standing recognition that possible prejudice against other defendants may be overcome by clear instructions limiting the jury's consideration of a post-conspiracy declaration solely to the determination of the guilt of the declarant, see also, *Cwach* v. *United States,* 212 F. 2d 520, 526–527; *United States* v. *Simone,* 205 F. 2d 480, 483–484; *Metcalf* v. *United States,* 195 F. 2d 213, 217; *United States* v. *Leviton,* 193 F. 2d 848, 855–856; *United States* v. *Gottfried,* 165 F. 2d 360, 367; *United States* v. *Pugliese,* 153 F. 2d 497, 500–501; *Johnson* v. *United States,* 82 F. 2d 500; *Nash* v. *United States,* 54 F. 2d 1006, 1007; *Waldeck* v. *United States,* 2 F. 2d 243, 245.

240

be considered by you solely in connection with your determination of the guilt or innocence of the defendant Whitley. It is not to be considered as proof in connection with the guilt or innocence of any of the other defendants.

"The reason for this distinction is this: An admission by defendant after his arrest of participation in alleged crime may be considered as evidence by the jury against him, together with other evidence, because it is, as the law describes it, an admission against interest which a person ordinarily would not make. However, if such defendant after his arrest implicates other defendants in such an admission it is not evidence against those defendants because as to them it is nothing more than hearsay evidence."

The substance of this admonition was repeated several times during the cross-examination of one of the government agents before whom the confession was made and a final warning to the same effect was included in the court's charge to the jury.[6] Nothing could have been

---

[6] "Before you make those motions—I will again advise the jury that any admissions by the defendant Whitley after the date of his arrest can be considered by you in connection with the determination of the guilt or innocence of the defendant Whitley together with the other testimony. But any admissions by the defendant Whitley are not to be considered as proof in connection with the guilt or innocence of any of the other defendants. The reason for that I explained before to you, that the admission by a defendant after his arrest of participation in an alleged crime may be considered as evidence by the jury against him with the other evidence because it is, as the law describes it, an admission against interest which a person ordinarily would not make. However, if such a person after his arrest implicates other defendants in such admission it is not evidence against them, because as to those defendants it is nothing more than hearsay evidence. I advise you of that in connection with the testimony of the last witness [Greenberg] as to any oral statements made by Whitley or any written statements made by Whitley."

more clear than these limiting instructions. Petitioner, who made no objection to these instructions at the trial, concedes their clarity.

We may also fairly proceed on the basis that the jury followed these instructions. Several factors favor this conclusion: (1) The conspiracy was so simple in its character that the part of each defendant in it was easily understood. There was no mass trial and no multiplicity of evidentiary restrictions. (2) The separate interests of each defendant were emphasized throughout the trial. Margiasso and petitioner were represented by one attorney. Each of the other defendants was represented by a separate attorney. Throughout the trial, the separate interests of each defendant were repeatedly emphasized by his attorney and recognized by the court.[7] A separate trial never was requested on behalf of any defendant. (3) The trial court postponed the introduction of Whitley's confession until the rest of the Government's case was in, thus making it easier for the jury to con-

---

[7] Safeguarding the separate interests of the defendants, the court also said:

"The existence of the conspiracy and each defendant's connection with it must be established by individual proof based upon reasonable inference to be drawn from such defendant's own actions, his own conduct, his own declarations, and his own connection with the actions and conduct of the other alleged co-conspirators.

.        .        .        .        .

"To find any defendant guilty of conspiracy you must find that he actively participated therein. Mere knowledge of an illegal act on the part of any co-conspirator is insufficient. Mere association of one defendant with another does not establish the existence of a conspiracy.

.        .        .        .        .

". . . if you find that every circumstance relied upon as incriminating is susceptible of two interpretations, each of which appears to be reasonable, and one of which points to a defendant's guilt, the other to his innocence, it is your duty to accept that of innocence and reject that which points to guilt."

sider the confession separately from the other testimony. This separation was pointed out by the trial court. Neither side thereafter introduced any evidence. (4) In the main, Whitley's confession merely corroborated what the Government already had established. In the light of the Government's uncontradicted testimony implicating petitioner in the conspiracy, the references to petitioner in the confession were largely cumulative. (5) There is nothing in the record indicating that the jury was confused or that it failed to follow the court's instructions.

It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice.

"To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions. There is nothing in this record to call for reversal because of any confusion or injustice arising from the joint trial. The record contains substantial competent evidence upon which the jury could find petitioner guilty." *Opper* v. *United States,* 348 U. S. 84, 95. See also, *Lutwak* v. *United States,* 344 U. S. 604, 615–620; *Blumenthal* v. *United States,* 332 U. S. 539, 552–553.

There may be practical limitations to the circumstances under which a jury should be left to follow instructions but this case does not present them. As a practical matter, the choice here was between separate trials and a joint trial in which the confession would be admitted under appropriate instructions. Such a choice turns on the circumstances of the particular case and lies largely within the discretion of the trial judge. Accordingly, we conclude that leaving petitioner's case to the jury under the instructions here given was not reversible error and the judgment of the Court of Appeals is

*Affirmed.*

[For dissenting opinion of Mr. Justice Frankfurter, see *post,* p. 246.]

## APPENDIX TO OPINION OF THE COURT.

"Whitley's confession reads as follows:

"United States of America,
"Southern Judicial District of New York,
"*ss.:*

"James Whitley, being duly sworn, deposes and says:
"I reside at 65 West 133rd Street, Apartment 4E, New York, N. Y. I make this statement in the presence of my attorney, Mr. Bertram J. Adams of 299 Broadway, New York, N. Y., after being fully advised that under the Constitution of the United States I have the privilege and right of not saying anything at all; that if I answer any question anything I say could be used against me in any criminal proceeding. Being fully aware of my rights, I make this statement of my own free will to Special Investigators Albert Miller and William Greenberg in the office of the Alcohol and Tobacco Tax Division, 143 Liberty Street, New York, N. Y.

"Sometime around Thanksgiving of 1949, a friend of mine introduced me to a man known to me as Tony. This man asked me if I wanted to buy some alcohol and I told him I did. The meeting occurred on 126th Street in Harlem. The man then told me to meet him the next day at a candy store on the south side of 119th Street, just east of First Avenue. When I got there, Tony introduced me to a man whose name I do not know. This man told me to meet him that night on 100th Street and Second Avenue. I met him there. He took my car and drove away. A little while later he came back and told me that the car was parked on 103rd Street and Second Avenue. I had purchased two 5-gallon cans of alcohol on that occasion and paid him just before he drove away in my car. Thereafter, I would meet this man around the candy store about twice a week and the same procedure would be followed. This continued until about June or July of 1950.

"Tony was about 5' 4" in height, about 55 years of age, had a dark complexion and stocky build and, I believe, had brown eyes. He was apparently of Italian extraction. The other man who sold me the alcohol was apparently also of Italian descent, and he had a dark complexion. He spoke in broken English. He had black hair and was about 27 or 28 years of age and was about 5' 9" in height. (Sometime in 1950, Investigator Whited of the Alcohol and Tobacco Tax Division asked me about him and showed me his picture.)

"At about that time, this man sent me to Carl. He introduced Carl to me and told me that Carl would take care of me from then on. I would meet Carl on Second Avenue between 121st Street and 122nd Street in a seafood restaurant and would purchase the alcohol from him.

"Carl is about 5' 10" in height, has blond hair, blue eyes, light complexion and is about 30 years of age. He is apparently of Italian descent. He is about 160 pounds.

Carl would usually come to my home to see me and ask me if I needed anything.

"Just before Carl went to jail in 1950, he introduced me to Bobby. I have been shown a photograph bearing ATU 3643 N. Y. dated 12/29/51 of Orlandi Delli Paoli, and I identify it as that of the man known to me as Bobby. This was sometime in the summer of 1951. Bobby would come to my house to see me. If I placed an order with him he would set the date and the time for seven or eight o'clock in the evening when I was to pick up the alcohol. The first time I met him at 138th Street and Bruckner Boulevard, in the Bronx. He took my car and was gone about one-half hour and then returned with the alcohol. The second time I met him on the corner of Bruckner Boulevard and Soundview Avenue. From then on he would alternate the procedure: I would meet him one night on 138th Street and the next time at Soundview Avenue.

"About two months ago, I began meeting Bobby at the Shell gasoline station known as the Bronx River Service Station on Bruckner Boulevard just past the bridge crossing over to Bronx River. I would usually leave my car parked on the street near the gas station and meet Bobby outside of the gas station. He told me not to go into the gas station as the attendant might not like it.

"About a month ago, Bobby introduced me to another man whose name I do not know. I have been shown a photograph marked ATU 3642 N. Y., dated 12/29/51 of Carmine Margiasso, and identify it as that of the man to whom Bobby introduced me. Bobby also told me that if he was not present when I met Margiasso, I was not to give Margiasso any money but was to pay him (Bobby) the next time I saw him. Margiasso also followed the same procedure: He would take my car, would be gone about 20 minutes, and then return with the alcohol. Margiasso picked up my car about four times.

"My purchases from Bobby would consist of two or three 5-gallon cans of alcohol at a time and were made once or twice a week. The last two times I paid Bobby $38 a can.

"On the evening of Friday, December 28, 1951, I had ordered two cans, and when Margiasso took my car I waited in the lunch room near the gas station. When I thought it was time for Margiasso to return, I went over to the gas station and waited in the office after purchasing a package of cigarettes. Two officers who were Federal officers came in and placed me and William Hudson under arrest. Shortly after that happened, Bobby drove up and was arrested by the Federal officers.

"I have read the above statement consisting of three pages and it is true to the best of my knowledge and belief.

"(Signed) JAMES WHITLEY
"James Whitley

"Sworn to before me
this 5th day of January 1952.

"(Signed) WILLIAM GREENBERG
"William Greenberg, Spec. Inv.

"WITNESS:
"(Signed) ALBERT MILLER
"Albert Miller, Spec. Inv."

229 F. 2d 319, 324–326.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN join, dissenting.

Prosecutions for conspiracy present difficulties and temptations familiar to anyone with experience as a federal prosecutor. The difficulties derive from observance of the rules governing evidence admissible against some but not all defendants in a criminal case. The tempta-

tions derive from the advantages of prosecuting in one trial two or more persons collaborating in a criminal enterprise. One of the most recurring of the difficulties pertains to incriminating declarations by one or more of the defendants that are not admissible against others. The dilemma is usually resolved by admitting such evidence against the declarant but cautioning the jury against its use in determining the guilt of the others. The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell. While enforcing the rule of admitting the declaration solely against a declarant and admonishing the jury not to consider it against other defendants, Judge Learned Hand, in a series of cases, has recognized the psychological feat that this solution of the dilemma demands of juries. He thus stated the problem:

> "In effect, however, the rule probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody else's." *Nash* v. *United States,* 54 F. 2d 1006, 1007.

It may well be that where such a declaration only glancingly, as it were, affects a co-defendant who cannot be charged with the admitted declaration, the rule enforced by the Court in this case does too little harm not to leave its application to the discretion of the trial judge. But where the conspirator's statement is so damning to another against whom it is inadmissible, as is true in this case,

the difficulty of introducing it against the declarant without inevitable harm to a co-conspirator, the petitioner in this case, is no justification for causing such harm. The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds. After all, the prosecution could use the confession against the confessor and at the same time avoid such weighty unfairness against a defendant who cannot be charged with the declaration by not trying all the co-conspirators in a single trial.

It is no answer to suggest that here the petitioner-defendant's guilt is amply demonstrated by the uninfected testimony against him. That is the best of reasons for trying him freed from the inevitable unfairness of being affected by testimony not admissible against him. In any event, it is not for an appellate tribunal to know how the jury's mind would have operated if powerfully improper evidence had not in effect been put in the scale against petitioner.

In substance, I agree with the dissenting opinion of Judge Frank, below, 229 F. 2d 319, 322, and would therefore reverse.