UNITED STATES of America,
Plaintiff,

v.

NATIONAL DAIRY PRODUCTS CORP.
and Raymond J. Wise, Defendants.

No. 20542.

United States District Court
W. D. Missouri, W. D.

May 28, 1964.

See also 196 F.Supp. 155.

Earl A. Jinkinson, Chicago, Ill., for plaintiff.

John T. Chadwell, Richard W. McLaren, Chicago, Ill., Martin Purcell, Kan-

sas City, Mo., John H. Lashly, St. Louis, Mo., for defendants.

JOHN W. OLIVER, District Judge.

This case pends on the separate motions of defendant Wise and defendant National for judgment of acquittal, notwithstanding the verdict and, in the alternative, for a new trial as to Counts Eleven, Twelve and Thirteen, and on the similar separate motion of defendant National in regard to Counts One through Ten.

The motions that relate to the Kansas City counts, (Counts Eleven, Twelve, and Thirteen) are identical except that paragraph 16 of defendant Wise's motion alleges in addition that we erred in refusing to sever defendant Wise and accord him a separate trial on the Kansas City counts for the reason that the introduction of evidence against defendant National on all the counts prevented defendant Wise from obtaining a fair trial in connection with the only counts in which defendant Wise was charged.

Defendant National's motion in regard to the distributor counts (Counts One through Ten, inclusive) contain many paragraphs that duplicate the allegations made in regard to the Kansas City counts and, except for naming different witnesses and different exhibits, follows the same general pattern of the separate motions that relate to the Kansas City counts.

The reasons assigned in all the pending motions, with one exception to be noted, are the reasons that careful lawyers usually assign in such motions in order that all questions of possible error be preserved for appellate review. For example, paragraphs 1 through 3 of defendant National's Kansas City counts motion are directed to our charge to the jury; paragraphs 4 through 9 relate generally to our rulings on questions of evidence; paragraph 10 and 11 are directed to the use we permitted and the procedure we followed in connection with the Grand Jury transcript; paragraphs 12 through 15 preserve defendants' various contentions concerning our refusal to sever and to grant separate trials, both in regard to the two defendants and in regard to the particular counts of the indictment; paragraphs 17 through 19 allege in general and usual fashion that the verdict is contrary to the weight of the evidence, that it is not supported by substantial evidence, and that it is contrary to the law; paragraph 20 alleges that we erred in denying the motion for acquittal filed at the conclusion of the Government's case and again at the close of all the evidence; and paragraph 21 alleges that we erred in overruling defendant Wise's motion to dismiss Count Thirteen.

Paragraph 16 of defendant National's motion, which we noted above as an exceptional allegation, reads as follows:

"16. The defendants were substantially prejudiced and deprived of a fair trial by reason of the comments and rulings by the Court, the restrictions placed by the Court upon cross-examination and presentation of evidence by defendants, and by the attitude of the Court toward defendants, defendants' evidence, and defendants' counsel during the trial."

The allegation just quoted is made in identical language by both defendants in regard to each count to which their separate motions are directed. (See paragraph 17 of defendant Wise's motion and paragraph A.11 on page 3 of defendant National's distributor motion directed to Counts One and Two. And see also paragraphs B.1 on page 3, C.1 on page 4, D.1 on page 4, and E.1 on page 5 of National's distributor motion where paragraph A.11 relating to Counts One and Two is incorporated by reference as being applicable to all of the other distributor counts).

In spite of the over 1000 pages of the post-trial briefs that have been filed, we do not believe it necessary for us to write an extensive memorandum and opinion in support of our action on the pending motions. In connection with the major contentions presented, the

transcript reflects our particular rulings and the reasons upon which those rulings were based. We have studied the briefs filed; we have read the authorities cited; we have again considered each of the over 7300 pages of the transcript of the trial proceedings and are satisfied that the defendants had a fair trial and that defendants' contentions are not tenable.

In our memorandum and order of May 1, 1963, prior to trial, we ruled defendant Wise's motion for a separate trial. We there cited and applied what we believed are the controlling authorities. At several points during the trial we reviewed the question of whether Rule 14 should be invoked.* We then determined that no necessity existed for its invocation. We are still of that view.

In like manner, our reasons for refusing to dismiss Count Thirteen are fully stated in another memorandum and order dated May 1, 1963. Our reconsideration of that question does not incline us to change our view of that question.

Both at the close of the Government's case in regard to the Kansas City counts and at the close of the Government's case in regard to the distributor counts, we called for briefs and heard extended oral argument on the question of the sufficiency of the evidence. The substance of the defendants' theory then presented is substantially the same as the substance of most of the arguments presented in more elaborate fashion in the post-trial briefs in support of defendants' motions for acquittal. See Tr. pages 2764 to 2826, and Tr. 4605 to 4672. On pages 2828 to 2839 and on pages 4672 to 4677, I expressed my views concerning the questions presented. My review of the entire record and my study of the briefs and the authorities cited does not convince me that the motions for acquittal should have been sustained.

██ A comparison of the arguments made at trial with the arguments made in the post-trial briefs, of course, reflects that the defendants in this case, after verdict, are more prone to indulge in vindictive and expletive language against the Government witnesses and the Government itself than they did in the arguments made during the trial. But we must, of course, judge the sufficiency of the evidence on the basis of the testimony as actually given. The post-trial argument that there was "nothing but suspicion as a basis for a finding of conspiracy" (page 41 of National's acquittal brief), for example, was made to and rejected by the jury (Tr. 6939, 6944–6945). We have determined that there was substantial evidence to support the verdict. We must and shall therefore rule that defendants' motions for acquittal notwithstanding the verdict must be denied.

We turn now to the alternative motions for new trial. In that connection we have again reviewed our charge. We obviously thought it fair when we gave it, or we would not have given it. We sought the aid and assistance of counsel early in the case and repeated our request for assistance at frequent intervals thereafter (see Tr. 2626, 2837–2839, 4676–4677, 5815–5822, 6585–6588). We used the assistance proffered and express our appreciation to counsel for their efforts.

We have reviewed our charge in light of our restudy of the transcript and are convinced that defendants' complaints do not go to matters of real substance.

In regard to defendants' comments concerning the outline of the evidence that had been adduced by both sides in connection with the particular counts, we have noted with some interest the suggestion made by Edward Bennett Williams in the panel discussion on The Problems of Long Criminal Trials held at the Judicial Conference of the Second Circuit last September as reported in 34 F.R.D. 155, at page 187. Mr. Williams suggested:

> "I think that the jury can best be helped if the legal abstraction is superimposed on the facts in evidence and the judge points out to the jury the possible points of inci-

---

* See Tr. 2846 and Tr. 2890 for examples of record.

dence. Now, what I'm suggesting is that in these cases the courts exercise their right to review the evidence and, if necessary, to comment on it. I suppose this sounds most unorthodox coming from a defense lawyer because generally when a trial judge suggests that he's going to talk about the evidence trial lawyers on the defense side of the table are struck with palsy, but I have enough faith in the objectivity of the trial bench to believe that they can be helpful to juries in delineating the evidence against a specific defendant and that no prejudice will inure to defendants from following this practice."

We did not believe that justice required that we comment on the evidence adduced by the parties. We so advised the jury (Tr. 7117). We did, however, believe that an outline of the evidence in regard to each count would focus attention on the questions of fact that the jury was required to decide. We are confident that our repeated reference to what was said in regard to the outline and its purpose (Tr. 7061, 7117, 7149, 7155, 7160) and our closing instruction that the jury should not regard anything said in the instructions as suggesting what we would do if we were acting as a juror (Tr. 7211) could not have been misunderstood or misconstrued.

Of course, we agree with Judge William B. Herlands' statement as a member of the same panel to which we have made reference, that "it is much easier to love justice than to administer it," (1. c. 175 of 34 F.R.D.). But we do not share defendants' evident agreement with the idea that a defendant has only a 50-50 chance of obtaining a fair verdict in a criminal trial and that we fool ourselves if we believe that a jury of laymen can listen to a three-hour oral charge and retain it (see footnote 7 on page 12 of Defendant National's acquittal brief).

At the close of the Government's evidence on the Kansas City counts, we gave an interim charge to the jury in order to provide a sharp separation between the evidence received against both defendants in regard to the Kansas City counts and the evidence that would immediately be adduced against only defendant National on the distributor counts (Tr. 2871–2885).

Counsel for the defense, after preserving defendants' position in regard to separate trial (Tr. 2845–2850, 2877, 2888–2889), and after stating that our statement to the jury as to how the distributor counts evidence was and was not to be considered (Tr. 2878–2885) was "a fair statement," commented that "I just don't think it is humanly possible for the jury to keep all this vast amount of evidence separate in their minds" (Tr. 2891). In further argument, defense counsel reiterated that "I think it is just physically impossible, mentally impossible to keep this straight and to follow the rule of law [as]to each count. * * *" (Tr. 2895).

Counsel's discussion of the obvious problem that protracted cases present to the administration of justice prompted us to make the following comment:

"THE COURT: I would make this comment here on the ability of a juror to keep straight [in] this, and I would add, any other anti-trust case. All of this proceeds on the assumption that the guaranties of the Sixth Amendment to a jury trial is calculated to be the best system for the ascertainment of fact.

"There is some slight difference of opinion on the subject as to whether this is the best instrument for the ascertainment of fact, but the presumption and the theory upon which we work is that it is, and I am quite sure that you share with me the system works almost in spite of its unwieldiness, if the great experience of other lawyers and other courts are intelligently applied to the particular situation at hand.

"So we must move from the major assumption that a jury in this and in all cases can intelligently follow

instructions from the Court." (Tr. 2898–2899).

The substance of that trial comment, of course, assumed that the interim instruction, as given, was a proper instruction, and it also assumed that the Court would give additional proper instructions throughout and at the end of the trial of the case. We have considered every charge made and believe that they were proper.

We believe now, as we believed at the time of trial, that the constitutional system of trial by jury is a viable one, even in protracted cases, and that the presumption that juries can and do follow the instructions of the trial judge does not rest upon myth.

The jury returned verdicts of Not Guilty on Counts 14 and 15 (Tr. 7339). We believe a quite convincing argument could be made that such action is consistent only with the idea that the jury was able to follow, and that it did in fact follow, the instructions given them by the Court. We cannot think of any other reasonable explanation of the jury's action.

After full and careful consideration, we are convinced that the jury was fairly charged in accordance with the law as we understand it, and that the administration of justice requires that we not overturn the verdict of the jury for any of the reasons urged by defendants.

Both in their written brief (page 161) and at post-trial oral argument, defendants suggest that we refused to exercise any judicial discretion in connection with the use of Grand Jury transcript. When defense counsel at oral post-trial argument suggested that "Your Honor placed it upon us, upon the repeated statement that you didn't have the discretion to go beyond that" (pages 30–31 of March 14, 1964 transcript) we suggested that what we thought that what we had said at trial was that "I had discretion but did not choose to exercise it and that * * * resulted in the tentative experiment in this whole area that is fully set out in the record" (page 31 of March 14, 1964

transcript). We further suggested that we had not felt any "strictures in this area" at the time of trial and that we thought that the record would so reflect (page 31 of March 14, 1964 transcript).

Our examination of the trial transcript reflects that our recollection was not inaccurate. When the use of the Grand Jury transcripts came up first (Tr. 422), we heard the arguments of counsel in chambers and then stated our view of the law and the procedure we would follow (Tr. 432–443). The record shows that we then indicated that it was our view that the controlling cases related to the question of whether "a trial judge has abused his discretion" (Tr. 432) and that we then outlined the procedure that we felt should be followed (Tr. 433–443).

At the time we ruled the first actual use of a Grand Jury transcript we stated that we were "going to experiment with this procedure, which I think is not only approved, but at least by implication recommended" (Tr. 447) and that if "complete fairness is not maintained to all parties" I would later consider determining "a different procedure;" but that, in connection with the first witness, I thought "we would get a bit of experience how it works" (Tr. 448).

We advised counsel that they should "feel perfectly free to renew [their] request for any different procedure" (Tr. 448). We emphasized that we thought that we could "maintain an even keel by experimenting with the present procedure" (Tr. 448). Defendants' counsel, of course, on various occasions throughout the trial, preserved his contention that a defendant has an absolute right to be furnished a copy of the Grand Jury transcript (Tr. 612, 5521, 5590–5591, 6357, and 6362). And on March 11, 1964, a bit late for trial use, counsel filed a supplemental memorandum on the grand jury transcript question.

The supplemental memorandum most recently filed does not cite a single page of the transcript of the trial proceedings. The particular pages of the transcript

cited by counsel for the defendant in their regularly filed post-trial briefs do not support defendants' assertion that we believed and acted on the idea that a trial court had no judicial discretion in this area.

■ Nor do those or any other pages of the transcript indicate that counsel for the defense thought, at the time of trial, that we were under the impression that we lacked discretionary power. We believe that we must rule this case upon what is shown by the record and not on any other basis. We believe the procedure established and followed in regard to the Grand Jury transcript was fair and within our discretionary power as defined by our controlling courts. We shall not disturb our trial rulings.

Two other paragraphs of defendants' post-trial motions raise questions of alleged error preserved at the time of trial. Both relate to our action in denying motions for mistrial in connection with particular counts of the indictment.

Paragraph 9 of both defendant National's and defendant Wise's motions for mistrial of Count Eleven alleges that we erred in connection with the Adams-Olson conversation related by the witness Adams.

■ That motion was made the day following our instruction to the jury concerning their duty to disregard Mr. Adams' testimony as to what Mr. Olson had said to him (Tr. 1831–1832). At the time we denied that motion we stated that we were of the opinion that not even a close question of law was presented (Tr. 1840). We are still of that view. We must proceed on the basis that the jury followed our instructions. See Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

Paragraph A.5 on page 2 of defendant National's motion directed to Counts One and Two alleges that we erred in denying defendants' motions for mistrial. Two such motions were filed. No particular point is made about either in defendants'

post-trial briefs but we must discuss both because they do relate to errors claimed at the time of trial and are specified in defendants' post-trial motions.

Defendant National's first motion for a mistrial of Count One was filed in connection with the Chapman Dairy issue. That motion was filed at 1:50 p. m. on Saturday, July 13, 1963, the day following the first discussion of Chapman Dairy.

The first mention of the existence of any problem or real issue concerning Chapman Dairy was made by counsel for the defense at a bench conference on Friday, July 12, 1963 (Tr. 3272–3282). At that time, the case had been in trial for one month; and twenty actual trial days had been completed. We denied defendant's motion for mistrial as the first order of business the next Monday morning, July 15, 1963, for the reasons we fully stated of record (Tr. 3427–3454).

Defendants' post-trial briefs do not so much as mention our ruling on that motion. We have, however, reviewed our action denying defendants' first motion for mistrial of Count One and have determined that our ruling was correct.

Defendant National's post-trial briefs do not focus any particular attention on the only other motion for mistrial made in connection with Counts One and Two. That motion for mistrial was made in connection with an incident that occurred in connection with the cross-examination of Government witness Theno. But passing reference is made in defendants' post-trial briefs to the fact that defendant National had even made such a motion (see bottom of page 206 c of defendant National's new trial brief). The legal question of whether we erred in denying that motion is not specifically discussed in defendant National's post-trial brief.

We nevertheless believe it necessary to review the record concerning the Theno incident in somewhat greater detail than we did in connection with the Chapman Dairy problem, because the Theno incident was cited at oral argument as an

example of why defendants' post-trial attack upon our fairness should not be considered as "a hindsight, after-the-game-was-over, attack on Your Honor" (page 16 of March 16, 1964 transcript of proceedings).

It is our judgment that a full review of the Theno incident, which was the only instance in which defendants requested any ruling of the trial court during the course of the trial on the basis of any alleged demonstrated prejudice, will also serve a useful introductory purpose for our required discussion of the allegations made in Paragraph 16 of defendant National's post-trial motion.

It must be remembered that counsel for the defense, at oral argument, told us that the Theno incident provided the "best answer" that they could give as to why they did not say anything during the trial about what they say for the first time in their post-trial motions and briefs concerning the allegedly highly prejudicial attitude we allegedly demonstrated against the defendants and defendants' counsel on a daily basis (see pages 16 and 17 of March 14, 1964 transcript). We now review the record concerning the Theno incident.

Mr. Theno was called to the stand as a Government witness (Tr. 3392). Early in his cross-examination, which commenced on page 3408 of the transcript, Mr. Theno was asked if he did not recall being quoted in a trade publication from which counsel commenced to read before the article had been introduced in evidence (Tr. 3410).

Government counsel objected (Tr. 3410). We asked to see a copy of the article which had not been furnished us (Tr. 3410); we experienced a little difficulty in getting to see it (Tr. 3411); were finally furnished a copy (Tr. 3412); and, as we were looking at the article, counsel continued to talk at each other (Tr. 3412). We therefore instructed counsel for both sides to make their remarks to each other out of the presence of the jury and instructed them to approach the bench (Tr. 3412). By that time it had become apparent that we would once again be required to straighten out another facet of what proved to be about the only really troublesome evidence problem encountered throughout the trial.

At the bench conference we advised counsel, out of the hearing of the jury, that our "ruling in connection with any effort to use this article stands exactly in the same category as I have attempted to consistently rule in regard to statements attributed to people in newspaper articles, to testimony in a Congressional record, or in any other document other than that which this witness—or, rather the particular witness on the stand, adopts as a statement he made at a particular time" (Tr. 3413–3414). (For instances reflecting earlier instances of the same general problem that had occurred before the Theno incident to which we were then making reference, see Tr. 758; 1170–1173; 1686–1688; 1692–1693; 1917–1919; 1948–1968; 1984–1987; and 2458–2466).

The colloquy at that bench conference (Tr. 3413–3422) reveals that counsel for the defense had intended to do exactly what he did do (Tr. 3417); that he had not visualized that a magazine article fell in the same area as a newspaper article (Tr. 3417–3418); that although we recognized neither side was particularly happy with our general ruling as to how hearsay documents were to be handled (Tr. 3418); we stated that we, nevertheless, "must insist that counsel proceed in accordance—both counsel, on both sides—with the rules that are laid down here" (Tr. 3420).

At that point, counsel for the defense advised us for the second time that day that he did not feel well and requested that we consider recessing until Monday (Tr. 3420; see Tr. 3421 for reference to the earlier request). We adjourned court until Monday (Tr. 3422).

On the following Monday, after we had ruled on two defense motions, one filed at 1:50 p. m. on the preceding Saturday, and the other filed at 9:10 a. m. on that

day (Tr. 3427–3454), Mr. Theno was recalled for further cross-examination (Tr. 3455). The magazine article was mentioned briefly on pages 3455–3456 of the transcript but inquiry into the detail of the article was not recommenced until page 3481 of the transcript. Examination concerning the article continued without incident up to page 3488 of the transcript. During that time the witness testified that a portion of the article did in fact refresh his recollection (Tr. 3484). Only three objections had been made by the Government during all of witness Theno's Monday morning cross-examination; we had over-ruled two and sustained one (Tr. 3461, 3463, 3482).

On page 3488, Mr. Theno was asked "Are you saying the article is wrong?" He answered: "I am saying I cannot be sure." Defense counsel then stated and asked:

"Q. You can't remember. There was no reason at that time for you to tell this reporter, Mr. Leathers, the absolute truth about these matters, was there, Mr. Theno?"

The following then occurred:

"MR. JINKINSON: Objected to, Your Honor, as being irrelevant and immaterial.

"MR. CHADWELL: [Mr. Purcell, not Mr. Chadwell, was conducting the cross-examination] Is counsel taking the position it is irrelevant whether he told the truth or not?

"MR. JINKINSON: I don't think, Your Honor—Mr. Chadwell knows that is not what I mean. That is improper.

"THE COURT: I will sustain the objection. You can ask him, Mr. Purcell, specifically as to any disagreement he may have, but this witness hasn't testified any differently than he has testified generally, and he admitted very freely that this has refreshed his recollection in particular instances.

"MR. PURCELL: I would like to approach the Bench, if Your Honor please." (Tr. 3488–3489)

At the bench conference, and out of the hearing of the jury, the following took place:

"MR. PURCELL: I object to the remarks of the Court as unduly restricting the effect of my cross examination of this witness. I object to the Court in the presence of the jury characterizing this man's testimony. Perhaps the Court believes that the cross examination is ineffectual, it hasn't proved anything, that it hasn't proved inconsistent statements, but this is a hostile witness.

"I think it is improper for the Court to vouch for this witness in the presence of the jury, to say to the jury, 'This man very fairly' stated this and that, that he has not said anything inconsistent with what appears in the article.

"I think it is prejudicial to the defendant and I think it is highly improper for the Court, as the Court has done, to belittle our attempt at cross examination of hostile, adverse witnesses, and in the manner in which it was said to me.

"If I had any effect on this cross examination, I submit the Court has discredited it.

"THE COURT: Mr. Purcell, would you like for me to advise the jury at this point that what the Court says in sustaining or not sustaining an objection is not to be considered nor does it reflect any view I have as to this witness' testimony, and that the testimony of this witness must be judged and appraised by the jury?

"I will be happy to give you that charge at this time if you want it, if it is your judgment that this would reflect adversely on what was—

"MR. PURCELL: I think Your Honor's remarks clearly washed out the cross examination.

"THE COURT: Let me know what you would like for me to do. Would you like for me to so advise the jury? I would be happy to do so.

"MR. PURCELL: Yes, that is the least that should be done.

"THE COURT: Very well, I will do that right now." (Tr. 3489–3491)

We then immediately instructed the jury as follows:

"THE COURT: Members of the jury, in connection with the exchange between Court and counsel, as evidenced just now, as is true in regard to any statement that the Court makes in ruling an objection by counsel for either side, you are again instructed, and you will be instructed still again in my final charge, that what the Court may say in connection with ruling an objection is not in any way to be taken as reflecting any view of a particular witness' testimony, and I will charge you again and reiterate throughout this trial that the judgment of the weight of the evidence and the credibility that you give a particular witness' testimony is your province alone, and not the Court's and you are not to assume from anything that the Court may say in ruling objections, by any counsel, and particularly the objection that I have just now ruled, that I intend in any way to reflect any view as to what weight, what credibility, you should give to Mr. Theno, in particular, or any other witness in general.

"Keep that in mind in connection with all witnesses and keep it in mind as far as Mr. Theno's testimony is concerned.

"You may proceed, Mr. Purcell." (Tr. 3491–3492)

After that instruction, the cross-examination of Mr. Theno continued (Tr. 3492) and was concluded without incident (Tr. 3505); defense counsel made inquiry about several other statements quoted directly from the article (Tr. 3492 to 3496); the article was admitted in evidence over the Government's objection (Tr. 3496; the witness was turned back to the Government for redirect examination (Tr. 3496); and after being passed back and forth for additional questions by both sides, was excused (Tr. 3505). Witness Sheehan was then called by the Government and his direct examination was completed before the noon recess.

After lunch, and at the start of the afternoon session, defense counsel, for the record, moved for a mistrial as to Counts One and Two, which we denied (Tr. 3538–3539).

When we inquired of defense counsel at oral argument as to why they did not say something at the time of trial about what they now say was our almost daily attitude "towards the defendants, the defense, our theories, and counsel during the trial" (page 16 of March 14, 1964 transcript), our question was answered by defense counsel's question: "What could we do about it?"

We suggest that the language used by counsel in the motion for mistrial of Counts One and Two in connection with the Theno incident could have been used during the trial as a model for motions that could have been filed in connection with other counts in the indictment to preserve any contention that we were almost daily reflecting an attitude of prejudice against defendants and their counsel.

Defendants' motion for mistrial of Counts One and Two made after the noon recess and our ruling on the motion made at that time reads as follows:

"MR. PURCELL: Mr. Jinkinson, Your Honor, may we approach the Bench?

"THE COURT: Yes.

(WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE BUT

OUT OF THE HEARING OF THE JURY:)

"MR. PURCELL: Come now the Defendants and move for a—

"THE COURT: Pardon me, would you let Mr. Purcell stand here?

"MR. PURCELL—for a mistrial as to Counts 1 and 2 of the indictment because of the comments made by the Court during the cross-examination of the witness Theno.

"By so commenting, the Court, we feel, practically removed from the jury's consideration the question of whether or not this witness was telling the truth as to matters crucial to the question of defendants' guilt or innocence. In so commenting, we believe that the Court usurped its function in the trial of this case, which is to act as an impartial arbiter. We state that we are fully mindful of the fact that lay jurors are duly and properly impressed by the comment and attitude of the trial judge, particularly in the Federal Court, and we further state that the comments of the Court prejudiced the defendant and such prejudice has not and cannot be removed by any cautionary instruction given to the jury by the Court.

"MR. JINKINSON: I think it sounds like the same motion made this morning, only know [sic] it was made after the Court gave the cautionary instruction which the Court asked if counsel wanted. Counsel wanted it and the Court gave it to him. I don't see how the instruction could be any more fair than it was and certainly it didn't help the Government any, I will say that. The Government was objecting to it because counsel wanted it.

"THE COURT: Well, I don't think it is any waiver of the point this morning, although I will overrule the motion."

We think the foregoing review of the record states the detail of the Theno incident from beginning to end.

On the basis of that review and our personal recollection of the Theno incident at the time of trial, we do not believe we erred in refusing defendants' motion for a mistrial of Counts One and Two.

Nor do we think that the Theno incident adds any weight to defendants' blanket attack upon this Court, the matter to which we now turn. We refer, of course, to the allegations contained in paragraph 16 of defendant National's motion.

Counsel for the defendants have made clear that in making their post-trial charge that our consistent attitude was highly prejudicial to the defendants they "do not contend that the Court intended to prejudice the defendants during the course of the trial"; they suggest that they "are certain that the Court felt that he was impartially presiding over the trial of this case" (page 201 of defendants' new trial brief). At the time of oral argument, in somewhat similar fashion, Mr. Chadwell opened his argument with the following statement:

"I want to repeat very sincerely, Your Honor, what Mr. Purcell has said, that is, by anything that we have said in our briefs or anything that he has said or anything I will say, we want to make very clear in the record that we do not wish Your Honor to understand that we are in any way indicating a belief that Your Honor was other than sincere and honest in your rulings from beginning to end in this trial. We don't think that at any time you were out to get us or out to get the defendants, but you tried to preside in this case fairly. We don't say anything else, and I want the record to make that clear." (Page 17 of March 14, 1964 transcript)

Defendants do not attempt to cite the transcript as to when and where the alleged instances of unintentional but nevertheless demonstrated prejudice were supposed to have occurred on "practically every trial day" (see page 203 of de-

fendants' new trial brief). But counsel's reiteration at oral argument makes clear that their assertion that "there wasn't a day that we went back to our office that we didn't feel—just didn't feel good about the treatment that we were getting here * * *" (page 16 of March 14, 1964 transcript) was not a slip of the pen.

To further complicate the problem of making any adequate review of the record, defendants state that the isolated portions of the record that they did quote in their post-trial briefs are "only illustrative, and not all-inclusive" (page 201 of defendants' new trial brief). We had no way of knowing during the trial that counsel felt as they now say they felt on practically every day of the trial. And, even after trial, we cannot guess what other alleged incidents are in their mind.

In raising the question presented by paragraph 16 for the first time after the trial was over, defendants state that "the comments and rulings of the court when viewed piecemeal might not appear to be prejudicial" (page 203 of defendants' new trial brief). But, defendants suggest that "when the cumulative effect is considered; when it is recognized that on practically every trial day an incident occurred, the jury necessarily received the impression that the court's attitude was adverse toward the defendants" and that "it is apparent that defendants were prejudiced and that they did not receive a fair trial" (page 203 of defendants' new trial brief).

The mere statement of defendants' post-trial position in regard to our allegedly prejudicial attitude makes it obvious that it is as difficult to come to grips with defendants' generalized blanket charge as it is to try to pick mercury from a broken thermometer off a tile floor.

 The mere fact, however, that the defendants remained silent during the trial does not make it unnecessary for us to rule the question raised by paragraph 16 of National's motion and the other paragraphs of both motions that repeat that allegation.

 The trial court in this case, as in any other case, is under duty to rule definitively on every point raised in a post-trial motion so that the appellate court neither has to guess nor search the record on its own account in order to ascertain what and why the trial court either sustained or denied any particular contention made by either party at or after trial.

Isolated portions of this record may not reasonably be read in support of any thought that this Court, either during the trial or at the present time, thought that it was being subjected to what Botein described as "The Gentle Art of Judge-Baiting", 29 N.Y.State Bar Bulletin 115 (I am indebted to Judge Herlands for the phrase and citation. See footnote 25 on page 175 of the panel discussion reported in 34 F.R.D.)

When the trial was quite well along, counsel for both sides led the Court to believe that it had not displayed any objective evidence of irritation toward either side in the case up to that point.

On June 27, 1963, one of counsel for the defense wanted to express his unhappiness with Government counsel and asked to approach the bench (Tr. 1672). After some not unheated discussion between counsel, defense counsel indicated that he also thought that we had shown "a good deal of irritation because we [defense counsel] were making the objection, and I think it is prejudicial to these defendants." (Tr. 1673)

We then made the following statement and request to counsel for both sides:

> "THE COURT: The record will show what it states. As far as any evidence of irritation, I think that is rather a broad statement. I am not irritated with counsel in this instance, nor have I been irritated at counsel in any other instance, and if counsel for either party feel that the Court has given any objective evidence of irritation at any place

throughout this trial, I wish they would state it in the record right at this time as to where it happened."

Neither counsel made any response to that request either then or at any other time before the jury returned its verdict. We ordered the trial to proceed (Tr. 1673).

At the time of trial we stated that we did not believe that the failure of defense counsel to respond as fully and as promptly to our repeated requests to be furnished the authorities upon which they were relying in regard to their particular legal theories evidenced any effort on the part of defense counsel "to mousetrap the Court" (Tr. 1438). (See, for particular examples of our requests for authorities, Tr. 854, 907, 943, 989, 1152, 1462, 1464, 1845–1846, 2066, 2379, 2625–26, 2954–55, 3083–3089, 3862, 4428–4429 and 5093. See also the pages of the transcript cited in connection with our discussion of our charge to the jury for examples of the separate requests made in that regard).

This is not to say counsel ceased to be vigorous in their representation of their respective clients, or that they gave the slightest evidence of being intimidated by the "great authority" of a federal judge (Cf. defendants' oral argument on page 17 of the March 14, 1964 transcript). Nor is it to say that this lawsuit was completely free of all heat and friction (on one occasion we spoke quite plainly to counsel for both sides (Tr. 1963–1964)). Nor is it to suggest that there were not some further occasions when four counsel, two from each side, were on their feet at the same time (Tr. 6385–6386).

But it is to say that one does not get a fair picture of how the trial of this case was conducted by viewing isolated and piecemeal occurrences as a general pattern that established the overall atmosphere of the trial. For example, we do not believe that Mr. Jinkinson's declared willingness to risk jail (Tr. 3142); or Mr. McLaren's not unheated suggestion to Mr. Jinkinson of "Don't talk to me like that" (Tr. 5984); or Mr. Jinkinson's suggestion that "the record should show there is no necessity of your [Mr. Purcell's] snarling at me * * * as you frequently do in this lawsuit" (Tr. 5306) were anything other than exceptional instances of counsel's expressions of tension and that such examples in no way reflect a fair picture of how counsel consistently treated each other or the Court.

We, of course, reached points in this case where further discussion among counsel, in our judgment, was producing "more heat between counsel than light to the Court" (Tr. 5988), but the rule in the trial of this case was that even when counsel sometimes commenced a conference in chambers with the Court in something other than the best of spirits (see page 3227 of the transcript for an example), they were consistently willing to try again and again to agree upon procedures that would simplify the trial of the case (see pages 3240–3246 of the transcript for the actual accomplishments of the conference that commenced under somewhat cloudy skies on page 3227 of the transcript).

We recognize that counsel for the defense had and have a job to perform. In a sense, a general post-trial charge that the defendants were substantially prejudiced and deprived of a fair trial by the comments and rulings of the trial court, by alleged restrictions placed upon defendants' cross-examination and their presentation of evidence, and by the trial court's alleged adverse attitude toward the defendants, defendants' evidence and defendants' counsel, about all of which defense counsel, with one exception (the Theno incident), remained silent throughout the trial, could be said to be an attack upon the judicial integrity of the Court itself. We do not so view it.

Every justice or judge of the United States, before entering upon the performance of the duties of his office, swears or affirms that he "will administer justice without respect to persons, and do equal right to the poor and to the rich, and that [he] will faithfully and

impartially discharge and perform all the duties incumbent upon [him] according to the best of [his] abilities and understanding, agreeably to the Constitution and laws of the United States" (28 U.S. C.A. § 453).

Strictly speaking, we think it is technically correct to suggest that there is no occasion for us to state of record that we did not intentionally violate that ancient oath. We are not charged with any intentional wrong-doing. But defendants' blanket post-trial attack is so blurred and generalized that we feel that the record should reflect that we believe that we complied fully, in letter and in spirit, with the obligation that we undertook when we became a judge of this Court.

▬ Under our system of administration of justice, it is my duty to rule definitely on all allegations contained in any motion for new trial. Accordingly, on the basis of the record and our personal observation of the trial, we find and determine that the defendants were not substantially prejudiced, nor were they deprived of a fair trial by reason of any comment or ruling made by us during the trial; we further find and determine that no unreasonable or prejudicial restrictions were placed on defendants' cross-examination or on their presentation of evidence on their behalf; and we further find and determine that the transcript of the proceedings in this case demonstrates that our attitude during the trial toward the defendant, defendants' evidence and defendants' counsel was one consistent with the obligations imposed by our oath of office.

We further state that we have restudied the entire transcript as a whole and that we have particularly studied the portions of the transcript that immediately preceded and followed the isolated portions quoted in defendants' brief. Such study and reconsideration and our recollection of the trial itself convinces us that it can not fairly be said that defendants' arguments in regard to our alleged demonstrated prejudicial attitude are in any degree tenable. We so find and determine.

. We finally state and determine that we have not deemed it necessary to discuss any of the alleged instances of demonstrated prejudice other than the Theno incident for the reason that no trial relief was either requested or denied at the time of trial in connection with any of those matters. We think it obvious that individual discussion of such alleged instances would be fruitless because defendants have seemingly held in reserve other instances to which they may desire to direct the attention of the appellate courts (see page 201 of defendant National's new trial motion where it is stated that the alleged instances presented for our consideration, even after trial, are only illustrative and not all-inclusive).

For the reasons stated, defendants' pending motions should be and are hereby denied.

It is so ordered.