{¶ 94} I respectively dissent from the judgment reached by my colleagues. I would reverse Breedlove's conviction and remand the matter for a new trial because I believe that the joinder error was not harmless as the majority concludes. *Page 21 
 {¶ 95} As stated by the majority, it would be extremely difficult, if not impossible, for the jury to consider Jones' testimony when determining Scott's guilt and then to completely disregard it when considering Breedlove's guilt, even though the court instructed it to do so. Opinion at ¶ 33. This created an unfair advantage for the state. As Justice Frankfurter observed in his dissent in Delli Paoli, "`[t]he government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.'" Bruton v.United States (1968), 391 U.S. 123, 129, 88 S.Ct. 1620, 20 L.Ed.2d 476, quoting Delli Paoli v. United States (1957), 352 U.S. 232, 247,77 S.Ct. 294, 1 L.Ed.2d 278.
 {¶ 96} Moreover, after Jones testified, Breedlove's counsel was put in the position of having to cross-examine Jones. Thus, the court's instruction to the jury that they were only to consider Jones' testimony against Scott would have been puzzling to them since Breedlove's counsel was involved in Jones' cross-examination.
 {¶ 97} Furthermore, it is critical to point out that had the state decided to call Jones as a witness from the beginning, the trial court would have severed Breedlove's trial from Scott's trial. The reason the court severed Breedlove's trial from Richardson's trial was because Richardson planned to call Jones as a witness. (May 2, 2005 Tr. 5). And the reason the court allowed a joint trial for Breedlove and Scott, was that the state represented that it did not plan on calling Jones to testify and, therefore, no Bruton issue would arise. (May 2, 2005 Tr. 4-6).
 {¶ 98} But Scott filed a notice of alibi a month before the trial. The trial did not begin until May 23, 2005. On April 26, 2005, Scott filed his notice of alibi. The state claimed that it did not receive this notice until the trial began. However, the notice was file-stamped and made a part of the record on April 26. Thus, at this time, the state should have been put on notice that Scott would present evidence at the joint trial that on the day of the shooting he was somewhere else. The state was then faced with preparing for trial and determining how it would rebut Scott's alibi evidence. The state chose to rebut Scott's alibi by calling Jones. Just days before trial, the state submitted a supplemental witness list. This list did not include Jones. (May 20, 2005 supplemental witness list). *Page 22 
 {¶ 99} Once Scott filed his notice of alibi it should have become apparent to the state that it would call Jones to rebut the alibi. The state was also well aware that had it informed the trial court that it would call Jones as a witness, the court would have severed Breedlove's trial from Scott's trial. Thus, once it became obvious to the state that it would be calling Jones to rebut Scott's alibi, the state should have brought this matter to the court's attention. Had it done so, the case would likely not have proceeded to a joint trial. The trial court made clear in the pretrial motion hearings that if the state planned to call Jones as a witness, then it would sever Breedlove's and Scott's trials. The trial court recognized that Jones' testimony was prejudicial to and inadmissible against Breedlove. By not informing the court of its intent to use Jones to rebut Scott's alibi, the state undermined the court's determination that Jones was not to be called as a witness at Breedlove's trial. And in doing so, it undercut Breedlove's right to a fair trial while appearing to be very disingenuous.
 {¶ 100} The majority concludes that the joinder error was harmless. It contends that whether Jones testified or not, the jury would have convicted Breedlove.
 {¶ 101} While in some cases the harmless error doctrine would apply to uphold the defendant's conviction, I cannot reach that conclusion in this case. Recently, in determining that the state erred in failing to turn over material evidence to a defendant, the Ohio Supreme Court addressed what constituted "material" evidence, and stated:
 {¶ 102} "In determining materiality, the relevant question `is notwhether the defendant would more likely than not have received adifferent verdict with the evidence, but whether in its absence hereceived a fair trial, understood as a trial resulting in a verdictworthy of confidence.' Kyles v. Whitley (1995), 514 U.S. 419, 434,115 S.Ct. 1555, 131 L.Ed.2d 490. Thus, the rule set forth in Brady is violated when the evidence that was not disclosed `could reasonably be taken to put the whole case in such a different light as toundermine confidence in the verdict.' Id. at 435, 115 S.Ct. 1555,131 L.Ed.2d 490. In the end, this standard not only protects defendants; by ensuring a fair trial, it also protects the system of justice as a whole." (Emphasis added.) State v. Brown, 115 Ohio St.3d 55,873 N.E.2d 858, 2007-Ohio-4837, at ¶ 40.
 {¶ 103} While in this case we are not faced with a situation involving the disclosure of material evidence, the Ohio Supreme Court's comments are still helpful. *Page 23 
We must not ask whether Breedlove would have likely received a different verdict if Jones had not testified, instead we must ask whether Breedlove received a fair trial "resulting in a verdict worthy of confidence." I cannot conclude that he did. As the Ohio Supreme Court has stated, the trial court must declare a mistrial when "a fair trial is no longer possible." Franklin, 62 Ohio St.3d at 127. Once Jones testified, a fair trial was no longer possible for Breedlove.
 {¶ 104} For these reasons, I would conclude that the trial court erred in not granting Breedlove a mistrial. *Page 1