PEARLIE BROWNEY v. THE STATE.

No. 16471. Delivered October 24, 1934.
State's Rehearing Denied February 27, 1935.

The opinion states the case.

*Hightower & Daniel,* of Liberty, for appellant.

° *Clyde E. Smith*, of Woodville, and *Lloyd W. Davidson*, State's Atty., of Austin, for the State.

MORROW, PRESIDING JUDGE.—The conviction is for an accomplice to murder; penalty assessed at confinement in the penitentiary for thirty-five years.

On the 14th day of February, 1933, the appellant, Pearlie Browney, was indicted as an accomplice to the murder of her husband, D. W. Browney, on or about the 14th day of November, 1932. The principal named in the indictment was Bee Barrow.

The order followed in the development of the case by the State is as follows: Bee Barrow, who had been tried and convicted for the murder of D. W. Browney and was at the time serving a sentence in the State penitentiary, testified upon behalf of the State that he had assassinated the deceased, D. W. Browney, on the 13th day of November, 1932, by slipping upon him in the nighttime and shooting him with a gun while he was sitting in his automobile unaware of the presence of Barrow. At the time of the homicide, Barrow was a citizen of Anahuac, in Chambers County. From Barrow's testimony, it appears that he and the appellant had lived and cohabited together for some time but that at the time of the homicide, they had ceased to live together, she having, in the meantime, become the wife of the deceased, D. W. Browney. In his testimony Barrow claims that the appellant had urged him to kill the deceased and had stated that after the death of Browney the proceeds of an insurance policy amounting to $1,500.00 on his life could be divided between Barrow and the appellant and they could live together in a certain log cabin which, according to his testimony, was mentioned by her. Upon the repeated insistence of the appellant, Barrow consented to kill the deceased. Appellant said to Barrow: "You do that killing tonight or else." Whereupon Barrow procured a gun, went to the place where the deceased worked, shot and killed him. According to Barrow, after commiting the murder, he returned to the home of the appellant at night time. She said to him: "Did you do the killing?" Barrow replied: "Yes, I done it." Appellant then said: "I am sure d——n glad of it. I worried and was aggravated and pestered with him until I am sick of it. I am glad you have killed him."

Barrow testified that after he was arrested, he made a statement confessing that he had killed Browney. In making the confession, he had the assurance that his penalty would be life imprisonment in the penitentiary. Barrow was thirty-

five years of age at the time of the trial. He gave testimony to the effect that he had tried to induce the appellant to marry him. Barrow had previously declined to make a confession and had denied the killing of Browney until after he was told by the officer to whom the confession was made that appellant had been arrested and placed in jail; that she had confessed and turned State's evidence and implicated Barrow as the murderer of Browney. In fact it was not true that appellant had confessed at the time that Barrow made the confession. Such is Barrow's uncontradicted statement. It was denied by no witness but was inferentially verified by one of the persons who witnessed Barrow's written confession. Barrow further testified that appellant did not testify against him at his trial. He said that he could not read; that he signed the statement on the 15th day of November, 1932, which was the day after the killing. In connection with the verbal testimony of Barrow, there was introduced in evidence his voluntary confession in writing which he had made and signed on the 15th day of November, 1932, in the presence of certain named police officers who had him in custody. The written statement, (which we understand was taken while Barrow was in jail), was in the form of a written confession, in which he had admitted his guilt as stated in his testimony to which reference has just been made. In the writing mentioned were declarations inculpating the appellant. Among other things Barrow stated in the written confession:

"She asked me while (we) were out on this old road if I would kill this old man that she was married to and I said: 'No, what do you think I am?' * * * She said: 'Well, you go ahead and do that and we can use that $1,500.00 insurance; we can take the $1,500.00 and buy the log-cabin filling station and do better than we are doing now.' * * * She said: 'I did not marry the old man because I loved him but I married him for the money he had.' A few days later she mentioned the killing of the old man to me again. I told her, No, that I did not care to do such a thing as that, but she insisted that I go ahead and do it; that things would be better and that no one would ever know anything about it."

"While I was at Pearlie's house (on night of November 13th), I wanted to go on back home, but she said: 'No, you go on and kill that old man tonight; don't fail; be sure to kill him.'"

After the killing of the deceased, Barrow reported it to the appellant who said: "I am sure d——n glad of it."

The State also introduced the statement of the appellant while she was in jail in which she stated in substance that she made the confession while in jail in the presence of the witness Gilmore. From the statement we quote: "Some time after 10 o'clock, P. M., Bee Barrow came to my house and knocked on the door and I got up and went out and he told me that he was going on down there and kill the old man, and I said: 'Bee, I don't know about that,' and he said, 'Why?' and I said: 'Because it will be found out.' Then he left and I went to sleep."

In the statement appellant admitted that after her marriage to Browney the insurance policy upon his life, which had been taken out in pursuance of the regulations of his employers, was changed by the insurance company so as to make her the beneficiary in case of his death instead of his estate.

It appears from Gilmore's testimony that he had taken from the appellant, Pearlie Browney, a written statement while she was under arrest. The statement was introduced in part by the appellant on the trial. From it we take the following:

"State of Texas, County of Liberty.—"This is a free and voluntary statement made by me to H. A. Anderson, deputy sheriff of Liberty County, Texas, after being duly warned by the said H. A. Anderson, first; that I do not have to make any statement at all, second; that any statement made by me must be free and voluntary on my part and may be used as evidence against me in the final trial or trials of the case or cases concerning which this statement is made, I do hereby make the following free and voluntary statement, to-wit:

"Gladys Sherman (wife of Dezry Sherman), told me that Bee Barrow told her that he was going to see that me and old man Browney did not live together and that she (Gladys) asked him, 'Why, what are you going to do?' And Bee Barrow told her that he was going to kill the old man and get him out of the way. Gladys said she told Bee Barrow: 'They are living together good and you leave them alone.' And that Bee Barrow told Gladys: 'I love her and I am going to see that that old man does not live with her; if I can't have her he God d——n sure can't.' Sometime after I married Mr. Browney, I met Bee Barrow down on the Liberty and Wallaceville Road back of the negro church out in the woods and we stayed out there and talked from about 10 o'clock in the morning until about 2 o'clock in the evening, and Bee Barrow asked me why I married old man Browney and asked me if I thought anything of him and I told him that I did, and I told Bee Bar-

row that I married Mr. Browney to get a home and for company. I told him the old man did not have any people and that he wanted somebody for company. Sometime after this I met Bee Barrow between Liberty and Moss Bluff and had a talk with him; he asked me how me and the old man was getting along and Bee Barrow asked me if I had figured out any way to get the old man out of the way and I said maybe you can figure some way to get him out of the way but I can't and am not going to. The next time I met Bee Barrow he told me that he would get the old man out of the way. I asked him how he would get him out of the way and he said he would shoot him. I told him that he could have that on his mind but that I was not going to have that on my mind for I was not going to do it."

The testimony of Mrs. Gladys Sherman was introduced by the State. According to her evidence, there were meetings between the appellant and Bee Barrow after her marriage to the deceased; that Barrow had stated to the witness: "I love Pearlie, and I am going to have her regardless." The witness said she did not tell Pearlie Browney that Barrow had said he loved her; nor did she tell her that Barrow had said that he would see that Pearlie and the deceased did not live together.

Bill of Exception No. 1 reflects the following occurrence: Bee Barrow was called as a witness by the State and testified that he killed the deceased upon the advice and command of the appellant. In connection with his testimony the State introduced Barrow's confession which he had made and signed while in jail. The written confession constituted an admission of guilt on the part of Barrow and embraced statements inculpating the appellant. Its reception in evidence was opposed upon the ground that Barrow, the principal, had already testified that he was guilty of committing the crime in question, and that therefore his extra-judicial confession was not available, it being hearsay as to the appellant. The cases holding that the confession of the principal may be used on the trial of the accomplice to fix the principal's guilt are not concerned with the question presented in the bill of exception to which reference has been made. They go no further than to give effect to the general rule that the admissions or confessions of the principal (if they would be admissible if the principal were on trial) are admissible on the trial of the accomplice, not for the purpose of proving the guilt of the accomplice but for the

purpose solely of proving the guilt of the principal. See White v. State, 10 Texas App., 167; Smith v. State, 237 S. W., 265.

Statements in the confession of the principal which relate solely to the guilt of the accomplice and which throw no light on the principal's actions, should be excluded. Smith v. State, supra; Hoyt v. State, 228 S. W., 936. However, if the expressions connecting the accomplice with the offense, when eliminated, render the confession incomplete and fragmentary, they may be received in evidence. In that event, the trial court should carefully guard the rights of the accomplice on trial by limiting the purpose of the confession to establishing the principal's guilt. Smith v. State, supra; Hoyt v. State, supra.

We know of no decision in this State extending the rules to which reference has been made. Whether it is proper to receive in evidence the confession of the principal when he is a competent witness and has testified, asknowledging his guilt, appears not to have been determined by this court. In this state, a convict is a competent witness. If the rule permitting the introduction of the principal's confession on the trial of the accomplice to establish the principal's guilt grew out of the fact of the incompetency of the convicted principal to testify as a witness, or his nonavailability by virtue of flight or his refusal to testify as a witness for the State, then no reason appears for applying the rule in the present case. As already pointed out, Barrow was a competent witness and testified fully to his own guilt as a principal offender. In other jurisdictions it has been held that when a principal is a competent witness against the accomplice and has testified acknowledging his guilt, evidence of confession on his part is not admissible. See Corpus Juris, vol. 16, p. 146; Bishop's New Crim. Evidence, (2d Ed.) vol. 3, p. 1230; Vaughn v. State, 57 Ark., 1, 20 S. W., 588. In view of the fact that a jury would be prone to consider the declarations embraced in the confession of the principal to corroborate his testimony as a witness given upon the trial of the accomplice and to support his credibility, we are constrained to hold that the general rule permitting the introduction in evidence of the confession of the principal to establish the principal's guilt has no application where, as in the present case, the principal is a competent witness against the accomplice and testifies, acknowledging his guilt.

By proper bill of exception appellant complains of the introduction in evidence of those parts of the confession of the principal showing the guilt of the appellant. The record re-

flects that appellant's counsel questioned the principal Barrow concerning some of the statements embraced in his confession, and further, laid a predicate for impeaching him by showing that while he was in jail he stated to one of the prisoners that appellant was innocent and had nothing to do with the killing of the deceased.  Upon the conclusion of the cross-examination, the State introduced in evidence those parts of Barrow's confession showing the guilt of the appellant.  Thereafter, appellant introduced a witness who testified that Barrow told him while he was in jail that he had implicated the appellant, but that she was innocent and had nothing to do with the killing of deceased.

Under the circumstances, the State takes the position that, under the general rule, the statements in the confession inculpating appellant were admissible to support the testimony of Barrow given upon the trial.  We deem it unnecessary to decide whether in any case the statements in the confession of the principal which show the guilt of the accomplice may be used to support the testimony of the principal when he has been impeached by proof of contradictory statements.  Whatever the rule may be as to that matter, the record here discloses that Barrow made the confession at a time when an improper influence or motive existed which might have prompted him to fabricate the statements embraced in said confession.  Barrow testified that after he was arrested and placed in jail he was advised by the arresting officer that appellant had turned State's evidence and made a statement charging him with the murder of deceased.  This information is not correct, as appellant had made no statement at the time.  Until this statement was made by the officer, Barrow had denied his connection with the killing of deceased, and declared that he knew nothing about it.  Upon being advised that appellant had placed the blame upon him, he made a confession in which he stated that he killed deceased after appellant had advised and encouraged him to commit the offense.  This matter was uncontroverted. Moreover, Barrow had the assurance before making the confession that his penalty would be life imprisonment in the penitentiary.  In effect he was assured that the State would not seek the death penalty against him.

It is well settled that where a witness has been impeached by showing that he made other and different statements in regard to the matter than those testified to by him on the trial, he can be supported by showing that he made similar statements to those testified to by him recently after the occur-

rence. However, if the supporting statement was made after a motive or inducement existed to fabricate, the supporting statement is then inadmissible. See Anderson v. State, 95 S. W., 1037; Conway v. State, 26 S. W., 401, Blackburn v. State, 180 S. W., 268; Porter v. State, 50 S. W., 380. Manifestly, there existed at the time the confession was made motive and inducement to fabricate. It follows, therefore, that it was not admissible for the purpose of supporting the testimony given by Barrow upon the trial.

In his charge the court instructed the jury as follows: "You are further charged that you cannot consider the written confession of Bee Barrow introduced by the State as any evidence of the defendant's guilt, and it can be considered by you only for the purpose of passing upon the guilt of Bee Barrow for the killing of B. W. Browney, and the weight to be given to Bee Barrow's testimony in this trial."

Thereafter the court instructed the jury that Barrow was an accomplice witness. Nowhere in the charge were the jury expressly advised that the confession of Barrow and the statement therein relating to the appellant's guilt could not be used for the purpose of corroborating his testimony given on the trial. Appellant timely and properly objected to that part of the charge authorizing the jury to consider the confession for the purpose of passing on the weight to be given to Barrow's testimony. The exception was to the effect that that part of the charge in question allowed the jury to consider the confession "indirectly if not directly against appellant"; and further, the charge was calculated to lead the jury to the conclusion that the confession might be considered as corroborative of the testimony of Barrow given upon the trial. The harmful effect of this charge is apparent. It was calculated to lead the jury to the conclusion that the confession of Barrow might be considered as evidence corroborating his testimony given upon the trial. Under the law it was incumbent upon the State to offer testimony corroborating Barrow, he being an accomplice witness. The statements embraced in the confession could not be used to corroborate him. This charge accentuated the error of the court in receiving the confession in evidence over appellant's proper objection.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In the motion for rehearing counsel

for the State appears to be in accord with the announcement in the original opinion to the effect that, generally in the trial of an accomplice to an offense, the confession of the principal is not admissible where such principal is a competent witness against the accomplice and testifies, acknowledging his guilt. It is insisted, however, that the confession of Barrow, the principal, became admissible by virtue of the fact that appellant cross-examined him as to certain matters embraced in the confession, and further, laid a predicate for impeaching him.

Adverting to the cross-examination mentioned, it is observed that the only question propounded to Barrow concerning his confession related to an isolated statement embraced therein. In short, as shown on page 18 of the statement of facts, the question propounded elicited from him the following statement: "I remember in that voluntary statement making a statement about like this: 'About three weeks after Pearlie Sherman and D. W. Browney were married I was over at Dezry Sherman's house, and I sent his little girl over to Mr. Richard Sherman's house and told her to tell Mrs. Richard Sherman to come over to Dezry's house, that I wanted to talk to her. Mrs. Richard Sherman came over to Dezry's house and she and I got in my car and came to Liberty and had dinner together at a restaurant.' I made that statement." Looking to the confession of Barrow, it appears that the statements therein showing his guilt and connecting appellant with the offense as an accomplice constitute a subject separate and distinct from that embraced in the above quotation. In his direct examination by counsel for the State, Barrow made exactly the same statement concerning Mrs. Richard Sherman as that elicited by appellant.

In Howard v. State, 92 Texas Crim. Rep., 221, 242 S. W., 739, which was conviction for murder, the State claimed that Ed Walker was the moving spirit in a conspiracy to kill the deceased. On cross-examination accused elicited from Tyler, a State's witness, the following testimony: "Ed Walker had told me where this whisky was, and I went and found it and put it back. He told me about this at an automobile right by the hotel over there at Hasse. About the whisky-making is not all that Ed Walker told me about. I am not lying about anything I said. I am telling the truth." On re-direct-examination, the State asked the witness to state all of the conversation that he had with Walker on the occasion inquired about by accused. Over objection, the witness told all of the purported conversation with Walker, in which was set forth the

guilt of Howard and two others. After reviewing the authorities this court reached the conclusion that the reception of such testimony constituted reversible error. In the course of the opinion, Judge Lattimore, speaking for the court, said: " * * * The witness on direct examination said that Walker had made a statement to him about Jack McCurdy being killed, and, on cross-examination, said witness had been asked if the conversation he had with Walker did not relate only to the whisky business, which question he answered in the negative. Did the defense by this question negatively answered, 'put in evidence' any part of said conversation relative to said killing? We are unable to perceive upon what sound theory this claim is based. The mere asking the question, if it was not true that the conversation had with Walker was only about the whisky business, would not seem to put in evidence any of said conversation which related to subjects other than such whisky business. * * * Article 811, supra (now Art. 728, C. C. P.,) plainly states that, when part of an act or declaration is introduced by one party, any other part or all thereof on the same subject may be introduced by the opposite party. The test is: Is that part offered by the opposite party on the same subject? If not, it is not admissible, even though it be in the same conversation. * * * Appellant, having elicited no part of the conversation on the subject of the killing, it was material error for the State to introduce same."

In the recent case of Davis v. State, 111 Texas Crim. Rep. 476, 14 S. W. (2d) 842, which was a conviction for attempting to pass a forged instrument, it appears that Davis had made a written statement before the grand jury. Upon the trial counsel for the State had cross-examined Davis relative to certain declarations in the statement. Thereafter Davis sought to introduce in evidence the entire statement. In concluding that the court properly declined to permit its introduction, we said: "This is the only thing in the statement outside the admissions elicited on cross-examination that relates to the subject of Anderson's signature to the bond. The remainder of the statement relates to securing the signature of other persons to the bond and is wholly foreign to the matter under investigation. The statement made by appellant before the grand jury, in so far as it related to Anderson's signature, was available to the State as original evidence against appellant as well as to impeach his evidence given on the trial. After he admitted on cross-examination that his testimony before the grand jury was in direct contradiction to that given on the

trial, there was no necessity for the State to put the grand jury statement in evidence, and it did not do so. Appellant contends that in reading from the grand jury statement in forming his questions the district attorney had in effect placed in evidence that portion of the statement which appellant admitted he had made, and therefore argues that such action gave appellant the right to introduce the '*whole*' of the statement. It is shown by the court's qualification that no restriction was placed upon counsel for appellant in interrogating him regarding the statement. If under the circumstances the right accrued to appellant to introduce any part of the statement, his contention, we think, is broader than the statute (art. 728, C. C. P.) which only authorized him to place in evidence the whole of the statement which bore upon the same subject."

See, also, Earnest v. State, 202 S. W., 739, and Payne v. State, 85 Texas Crim. Rep., 288, 212 S. W., 161.

We next advert to the contention that the confession became admissible by virtue of the fact that a predicate had been laid for the impeachment of Barrow. Counsel for the State insists that we were in error in the original opinion in our statement to the effect that before making the confession Barrow had assurance from those in proper authority that the penalty assessed against him would be life imprisonment in the penitentiary, and, in effect, that the State would not ask that the death penalty be assessed against him. On page 32 of the statement of facts occurs the following in the testimony of Barrow: "I testified in the trial before this. I testified in the examining trial. There was not anything said about my testifying only that I would be sentenced to the penitentiary for life. That was all that was ever said to me; that if I testified against her I would be sentenced to the penitentiary for life. My lawyer told me that. He did not say that they would waive the death penalty. He just told me he had agreed with the State, and that if I testified in this case I would go to the penitentiary for life. I agreed to that."

In the original opinion we construed the foregoing statement to relate to a promise made to Barrow before he made the confession in question. It might be that we placed the wrong construction thereon, and that the language used should have been interpreted to mean that the promise came after the confession was made, but prior to the time that Barrow testified upon the trial. If the construction contended for by counsel for the State be given said language, we take it that a decision of the point involved is not materially affected for the

reason hereinafter stated. The State's testimony showed that when Barrow was arrested he denied any connection with the killing of deceased, and told the officers he knew nothing about it: In the testimony of Barrow is found the following: "Mr. Anderson (deputy sheriff) brought me here. He told me that they had arrested Mrs. Browney (appellant) and told me she had told him the truth about it. That was when Mr. Anderson had me. He told me that Mrs. Browney was arrested and that she had told that I had done it. That is what Mr. Anderson told me. He told me that they had got her locked up here, and that she had turned State's evidence and told the details of the whole thing. That was when I made this statement. I had not made a statement up until then. Up until the time that Mr. Anderson brought me in here and told me that she had made a statement I had not made a statement. I hadn't ever told him I had killed him. After Mr. Anderson told me she had confessed to the whole thing and turned State's evidence I made this statement. Nobody told me after I had signed this statement, Mr. Anderson or anybody else, that Pearlie (appellant) had not turned State's evidence. He told me she had before I made any statement. I did not see the statement that she had made. He did not show me a statement. She didn't offer to testify against me in my trial. They didn't use any statement she made against me in my trial."

After appellant was arrested she made a written statement in which she said that Barrow had told her he was going to kill deceased and had later told her that he had carried his threat into effect. In this statement appellant denied that she encouraged Barrow to commit the offense. As shown on page 42 of the statement of facts, a witness for the State, who tesified concerning the statement made by appellant and Barrow, said: "He (Barrow) made his written statements before her statement was made. I think someone in my presence told him that Pearlie Browney, the defendant here, had been arrested." The testimony of the same witness, as shown on page 44 of the statement of facts, is as follows: "I was with Mr. Anderson when he went and got Bee Barrow. I do not think Mr. Anderson told Bee that Pearlie had signed a statement. *I do not think she had said anything before then about the killing. I witnessed both statements. Bee Barrow made the first one. I do not think we had talked with Mrs. Browney at that time. At the time Bee Barrow had MADE HIS STATE-MENT Mrs. Browney had not at that time told that Bee Barrow had committed the crime."* (Italics ours.)

The foregoing testimony, and particularly that part italicized, manifestly supports our statement in the original opinion to the effect that Anderson's statement to Barrow that appellant had turned State's evidence and charged him with the murder of deceased was not true. Thus, we have a situation in which the State's witnesses, whose credibility was vouched for by the State, gave testimony showing that Barrow declined to make a statement until it had been falsely stated to him by one of the officers that appellant had turned State's evidence and charged him with the offense. Under the circumstances, we are constrained to adhere to our conclusion that the confession was not admissible to support Barrow because made after there existed a motive or inducement to fabricate. In this connection, it is observed that the position of State's counsel that objection was not made to the confession on the specific ground that there was a motive to fabricate is correct. However, in view of another trial and of the contentions now made, we think attention should be called to the matter.

We are constrained to adhere to our conclusion that under the facts reflected by the record, that part of the charge of the court referred to in the original opinion was erroneous, and calculated to prevent appellant from receiving a fair and impartial trial at the hands of the jury. We deem it unnecessary to enter into further discussion of the question.

The State's motion for rehearing is overruled.

*Overruled.*