**964**

William J. Terry, Tampa, Fla. (Court appointed), for petitioner-appellant.

Robert L. Shevin, Atty. Gen., Tallahassee, Fla., Mary Jo M. Gallay, Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD,* District Judge.

DUMBAULD, Senior District Judge:

The question for determination in the case at bar is whether the record contains sufficient independent evidence, apart from the extra-judicial statement of a nontestifying co-defendant erroneously admitted into evidence contrary to the doctrine of *Bruton*

**Roger Lee HALL, Petitioner-Appellant,**

v.

**Louis L. WAINWRIGHT, Director Division of Corrections, etc., Respondent-Appellee.**

No. 76–4235.

United States Court of Appeals, Fifth Circuit.

Sept. 21, 1977.

---

* Senior District Judge of the Western District of Pennsylvania, sitting by designation.

*v. U. S.,* 391 U.S. 123, 135–37, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to establish conclusively the defendant's guilt beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We are convinced that it does.

Appellant Roger Lee Hall's petition for habeas corpus was denied on September 13, 1976, by the District Court for the Middle District of Florida, Tampa Division. Hall was convicted of murder in the first degree without recommendation of mercy in the Circuit Court of Hillsborough County, Florida and received a sentence of death. Subsequently, as a result of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of Florida reduced the sentence to life imprisonment, and as so modified, affirmed the conviction. Hall was the actual killer of one Tucker Hyde, having been hired by Deanne C. Hyde, wife of the victim. One Clara Deal was the intermediary or go-between who negotiated the "contract."

Confessions of all three parties were taken in the presence of all three of them. Defendant Deal made a deal, entered a plea of second degree in her own case, and testified for the State at the trial of Hall and Hyde. Hyde did not take the stand.[1] Deal did take the stand implicating Hyde and Hall.[2] At the trial, the confessions of all three parties were received in evidence.[3]

■ Since Hyde did not testify, use of her confession was improper under *Bruton.*[4] But under *Harrington* such error was harm-

less. Deal did testify. Her oral testimony would have sufficed to convict Hall. Her confession was properly admitted under *Bruton.* And of course Hall's own confession was properly admitted against himself. His own testimony, when he took the stand against his counsel's advice, also served to inculpate him and corroborate Deal.

■ Careful reading of the trial transcript (which embraces 1914 pages) establishes that the District Court's decision (as well as the Magistrate's report) is fully supported by the record.

The record demonstrates not only (1) that there was adequate independent untainted evidence, apart from Mrs. Hyde's confession, to assure the conviction of appellant Hall; but also (2) that Mrs. Hyde's confession, insofar as Hall was concerned, was merely cumulative and had minimal or negligible impact upon the case.

It was Clara Deal's testimony (together with his own, given against his counsel's advice) that demonstrated Hall's guilt. As his counsel said in his closing argument: "The State . . . places its case on Clara Deal. . . . Without Clara Deal the State has a most flimsy case insofar as Roger Hall is concerned."[5]

The substance of Mrs. Hyde's brief statement is embodied in one answer:

"Q. Is what Clara testified to just now basically the way things occurred?

A. Everything that concerned me that she said was—is true. About the

---

**1.** Hyde offered no evidence at all. Tr. 1723. [References to the transcript of the trial will be indicated by the abbreviation "Tr."] Hall did take the stand, contrary to his counsel's advice. Tr. 1634, 1637–1714.

**2.** Deal's testimony appears at Tr. 1438–1629. Cross-examination began at Tr. 1493. Cross-examination on behalf of appellant Hall extends from Tr. 1550 to 1617.

**3.** Tr. 1175–1258. After warnings to all defendants, Deal's statement appears at Tr. 1187–1215; Hyde's at Tr. 1216–1229; Hall's at Tr. 1231–1258.

**4.** Apparently the officers thought it would satisfy *Bruton* if all three parties were present together when their separate statements were taken. Transcript of May 17, 1972 (Motions to Suppress), pp. 115–16. This practice may add to the credibility of the statements by permitting instant contradiction if any party wishes to deny what others say, but no defendant is under any duty to speak so far as his constitutional rights are concerned, and cannot be said to have adopted the other defendants' statements as his own by remaining silent. *Bruton* can not be thus circumvented.

**5.** Tr. 1743, 1864.

other things about what happened away from the house, that I don't know." [6]

Two other pages of the short statement mention Hall. Here again she merely corroborates vaguely what Clara Deal had testified about in detail:

"Clara told me that Roger said Ten Thousand Dollars, and I said 'Yeah, but how'?"

She was then asked:

Q. Okay. But what Clara has told us about your talking over Roger's killing Tucker, is true?

A. Yes.[7]

Q. And you told Roger that you wanted him to kill Tucker?

A. Yes . . . If I had had the nerve, I would have killed him myself a long time ago.[8]

Insofar as defendant Hyde was concerned, the only defense asserted was that it was "justifiable" homicide to kill her husband, since he should have been killed, because he made life miserable for his wife. In particular, he procured Clara Deal to come to the Hyde home and engage in Lesbian relations with Deanne Hyde [9] while Tucker, on one occasion at least, spent considerable time alone with a male companion.[10] Tucker Hyde also exercised his constitutional right to have a package containing seven pornographic films in his home.[11] See *Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

Hall's defense was a denial that he killed Hyde. He admitted planning the murder, getting the rifle, and watching the victim arrive at his home, but asserted that he "chickened out" [12] and went home, shortly after 12:30 a. m., leaving the rifle in Clara Deal's car.[13]

Clara, it was implied, had an independent motive on her own account to kill Tucker Hyde, since he had "made up" with his wife and returned to the family domicile, thus ousting Clara from her residence and relationship there with Deanne Hyde.[14]

The drawback with the defense theory was that it would have required the jury to believe that, within a short time just before the murder was consummated, Clara could have found a white male accomplice to replace Hall when he withdrew from the conspiracy at the eleventh hour.

For it happened that a cruising police officer became suspicious when he saw two cars coming out of a State forest at 4 a. m. on June 11, 1971, and took their license numbers.[15] The front car was that of the murder victim, and was driven by a white male.[16]

Hall also asserted that he would have used his pistol rather than a rifle, if he had done the killing, but admitted that the rifle would make less noise.[17] He also admitted familiarity with the pond (having fished there) where Clara and her accomplice had dumped the rifle and the bloody bedclothes after the murder, and she had pointed out

6. Tr. 1218. Mrs. Hyde's entire statement contains only 13 pages.

7. Tr. 1219–1220.

8. Tr. 1220. Mrs. Hyde had discussed her desire to kill her husband so extensively that several people knew about it, including a police officer. Tr. 1273, 1337–40.

9. Clara Deal "took the Fifth" when asked about her Lesbianism. Tr. 1525, 1540–41. She admitted receiving $1000 from Hyde. Tr. 1512.

10. Tr. 1118–20. The court overruled defendant Hyde's proffer to prove Tucker's homosexuality.

11. Tr. 1326–27.

12. Tr. 1710–11, 1661–64, 1666–67, 1686–87, 1704, 1705.

13. Tr. 1666.

14. Tr. 1522–23.

15. Tr. 1038, 1041. The rear car was Clara Deal's, and directed the investigation towards her, leading to her confession, implicating the other two defendants.

16. Tr. 1040. Because of darkness at the time, the officer was unable to identify Hall at a lineup. Tr. 1044.

17. Tr. 1711–13.

the spot to police who retrieved them as exhibits.[18]

Clara's oral testimony at the trial, as well as her confession, graphically described the murder and its sequel. She was in another bedroom with Mrs. Hyde (who did not want to see the killing or the body afterward; she later reported her husband as a missing person to the police) when the shot was fired. But Clara Deal saw Hall move with the gun towards the open door of the victim's bedroom; she heard the shot; then saw the bleeding body when Hall called to her to bring a towel.[19] She got a washrag and wiped off Hyde's neck at Hall's direction.[20] Hall dressed the victim, put the body and the bloodstained articles in Hyde's car, and drove off, followed by Clara Deal in her car to furnish him a ride home.[21] Hall threw the body into a ditch.[22] Later the murder weapon and bloodstained bedclothes were thrown into a pond, where Clara afterwards assisted the police in finding them.[23]

From the foregoing analysis of the "overwhelming" independent evidence against Hall, quite apart from the brief confession of Mrs. Hyde, which had no significant additional impact insofar as Hall is concerned, it seems clear that the "violation of *Bruton* was harmless beyond a reasonable doubt," as required by the *Harrington* standard (395 U.S. at 254, 89 S.Ct. at 1728).

---

**18.** Tr. 1660. The articles were retrieved by the police on June 15, 1971. Tr. 1292–99.

**19.** Tr. 1464–66.

**20.** Tr. 1467.

**21.** Tr. 1471–72.

**22.** Tr. 1475. The body was discovered by police two days later, on June 13, 1971. Tr.

974–75. Subsequently Hyde's locked car was found on the highway. Tr. 995.

**23.** Tr. 1478–83. See note 18 *supra.* The keys to Hyde's car, and some extra bullets, were thrown away at a third location. Tr. 1482.