**Woodrow Wilson SMITH, Petitioner-Appellant,**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellee.**

**No. 76–4297.**

United States Court of Appeals, Fifth Circuit.

March 20, 1978.

Bertrand C. Moser, Houston, Tex. (court-appointed), for petitioner-appellant.

John L. Hill, Atty. Gen., John Pierce Griffin, Asst. Atty. Gen., David M. Kendall, 1st Asst. Atty. Gen., Joe B. Dibrell, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before THORNBERRY, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

On June 13, 1964 petitioner, Woodrow Wilson Smith, was convicted as an accomplice to murder with malice and sentenced to ninety-nine years imprisonment. Although Smith took no appeal, he later filed a state habeas corpus petition alleging, inter alia, that the state violated Smith's sixth amendment right of confrontation by

introducing into evidence, over Smith's objection, the confession of Willie Coverson, previously convicted as a principal offender in the crime. The Texas Court of Criminal Appeals found that Smith's constitutional right had been violated, but denied Smith relief on the ground that the error was harmless. *Ex parte Smith,* 513 S.W.2d 839 (Tex.Cr.App.1974). Having exhausted his state remedies, Smith then renewed his claim in this federal habeas corpus proceeding. The district court denied Smith's application for the writ, agreeing that the error was harmless beyond a reasonable doubt. This appeal followed.

The indictment charged that Coverson along with two other persons, John P. Allen and Howard Connolly, acting together unlawfully and with malice aforethought shot and killed L. T. McGee, uncle of the petitioner Smith. It further charged that Smith, though not present at the commission of the offense, advised, encouraged, and commanded the principals to kill McGee. Part of the state's burden in establishing Smith's guilt as an accomplice was, therefore, to prove beyond a reasonable doubt the guilt of the principal, Coverson.

The judgment of conviction entered against Coverson in his separate trial was introduced at Smith's trial in order to prove Coverson's guilt. In addition, the state introduced into evidence the unredacted text of Coverson's confession.[1] This confession not only set out his own participation in the crime, but fully detailed Smith's role. Indeed, considered in toto, Coverson's confession established every material element of the state's case against Smith. Coverson, though present in the courtroom during Smith's trial, was never called to the stand by the state.[2]

### I.

A well-settled rule of Texas law permits the introduction into evidence of admissions or confessions of a principal (if they would be admissible were the principal on trial) at the trial of an accomplice, not for the purpose of proving the guilt of the accomplice, but solely for the purpose of proving the guilt of the principal. *Schepps v. State,* 432 S.W.2d 926, 938, 940 (Tex.Cr.App.1968) (on motion for rehearing); *Browney v. State,* 128 Tex.Cr.R. 81, 79 S.W.2d 311 (1934). Admissibility of such confessions under Texas law is hedged about with two crucial protections. Since the confession is not to be used as evidence of the guilt of the accomplice, parts which tend solely to implicate the accomplice must be excised. Only if such references are so interwoven with the remainder of the confession that such exci-

---

1. The portion of Coverson's confession linking Smith to the crime is as follows:

    On November 23, 1963, the date that they buried the President, Howard Connally, John Allen, Woodrow Smith and myself all went to Bryan, Texas. We went in two different cars. I rode with Howard Connally in Howard's 1955 Buick, white looking. John Allen and Woodrow Smith went in a brown looking Dodge, Plymouth, or DeSoto. I don't know just what kind of car it was but it was a Chrysler product. I don't know what time it was when we arrived in Bryan, but it was sometime just before dark. Both of the cars stopped near a cafe in Bryan. Woodrow Smith and John Allen got out of their car and came over and got in the car with us. We all four just drove around in Howard's car and Howard was doing the driving. This man Woodrow Smith told Howard, said 'There's the place, can you find it? Howard told him that he could. We then drove back to Bryan. This place that Woodrow pointed out was the place where the man lived that Howard was

supposed to kill. After we got back to Bryan, John Allen and Woodrow Smith both got out of Howard's car. As they were leaving Smith said that he had to go to work—that he would see you in the morning. He was talking to Howard at the time . . . . .

As stated by the Court of Criminal Appeals:
    The foregoing portion contains the sole references in the confession to the actions of petitioner. In the remainder of the confession, Coverson told in detail of the manner in which deceased was shot and killed, naming Howard Connally as the actual killer, and implicating himself as a principal.
513 S.W.2d at 841–42.

2. Under Texas law prevailing at the date of Smith's trial, Smith could not call Coverson as a witness. A Texas rule of evidence barred persons charged as principals, accomplices, or accessories in the same crime from calling one another as witnesses. The rule was declared unconstitutional in *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

sion would make it incomplete and fragmentary is the confession admissible *in toto.* In all cases, moreover, where the principal's confession is admitted, the jury must be carefully and properly instructed that it may consider the confession only to establish the guilt of the principal and may not consider it to establish any link between the accomplice and the principal. *Schepps v. State, supra,* 432 S.W.2d at 941.

In the case at bar, however, the hedges to admissibility were trimmed sharply. In its opinion in this case, the Court of Criminal Appeals held explicitly that references to Smith could have been deleted without rendering Coverson's confession incomplete or fragmentary. 513 S.W.2d at 843. The damning hearsay inculpating Smith, then, was neither susceptible of lawful consideration by the jury nor necessary to fair presentation of material which was so susceptible. To make matters worse, Coverson's confession was admitted under instructions to the jury that taken together are, at best confusing on the crucial point of the permissible use of Coverson's confession. Immediately prior to the reading of Coverson's confession, the trial judge instructed the jury as follows:

> Please bear in mind that this exhibit [the confession] is being admitted to you, not under general rules of evidence, but it is to be considered only as to whether or not it bears on who killed L. T. McGee, if anyone, *or any possible connection, if any, that those persons had with the defendant.*

(Emphasis added.) While a subsequent instruction and the judge's final charge to the jury correctly stated the applicable limitations on the jury's consideration of Coverson's confession, the trial judge never told the jury that his first instruction was erroneous, and even a reasonably attentive juror could well have concluded that the original instruction stood.

## II.

In considering Smith's claim, we must be mindful of the traditional importance of cross-examination to the trial process. As the Supreme Court has said,

> The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining process." *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970); *Bruton v. United States,* 391 U.S. 123, 135–137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

*Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973). Introduction of an out-of-court confession of a participant in crime implicating a co-participant at the trial of the co-participant without opportunity for cross-examination is generally incompatible with the guarantees of the Confrontation Clause. *See, e. g., Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Indeed, at the trial of Sir Walter Raleigh for treason, it was the Queen's use against Raleigh of Lord Cobham's confession implicating Raleigh that generated Raleigh's famous demand that his accuser be brought before him. Revulsion against the conduct of Raleigh's trial is considered by many one of the wellsprings of the sixth amendment right of confrontation. *See Park v. Huff,* 506 F.2d 849, 861–62 (5th Cir. 1975) (en banc) (Gewin, J. concurring).

A mechanical equation of cross-examination and the constitutional right of confrontation is to be avoided, however.

Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *E. g., Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). But its denial or significant dimi-

nution calls into question the ultimate "'integrity of the fact-finding process'" and requires that the competing interest be closely examined. *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

*Chambers v. Mississippi, supra.* Indeed, on such "close examination," we have found constitutionally permissible the introduction of a principal's confession implicating an accomplice at the trial of the accomplice where the confession was admitted in strict compliance with the crucial safeguards we noted earlier. *Hoover v. Beto,* 467 F.2d 516, 526, 528 (5th Cir. 1972) (en banc), *cert. denied* 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673. We found that the "State Trial Court carefully followed the Texas rule of evidence," *Id.* at 526. References to the accused could not be deleted without making the remainder of the confession incomplete and fragmentary and immaculate instructions were given to the jury respecting the permissible uses of the confession. *Id.* at 526–28. In *Hoover,* then, the state had done everything it could to limit the jury's improper use of material which could not be deleted without destroying the meaning of admissible evidence crucial to the state's case. In these circumstances, a closely divided court held that the absence of opportunity for cross-examination did not violate the confrontation clause given satisfaction of yet a third condition, presentation of independent evidence which provided the trier of fact with a satisfactory basis for determining the reliability of the inculpatory statement.

As we have seen, the case at bar presents a vastly dissimilar situation. Here, admission of the unexpurgated confession served no "legitimate interests in the criminal trial process" whatsoever, since the portion accusing Smith was wholly unnecessary to fair presentation of Coverson's confession for its lawful use. Here, moreover, whatever ameliorative effect proper instructions to the jury might be supposed to have in this context, *compare Hoover v. Beto, supra,* 476 F.2d at 528, 530 with *Bruton v. United States, supra,* 88 S.Ct. at 1623–27, the inconsistent instructions given in this case make it impossible to indulge the hypothesis that Coverson made no statement inculpating Smith. *See id.*[3] The knotted, tangled skein of instructions given in this case could only be unravelled by a juror with the talents of an intellectual Houdini. Curative words must be clarion and clear in this context. Twelve jurors do not constitute a memory bank capable of recalling, analyzing, and parsing each judicial phrase. Where there are conflicts, contradictions, and nuances of the kind presented here, the potential for abuse is manifest. We therefore agree with the holding of the Texas Court of Criminal Appeals that Smith's right to confront witnesses against him was violated in the circumstances of this case.

We cannot agree, however, that the error was harmless beyond a reasonable doubt. The state's theory of the case was that Smith had instigated the murder of McGee, his uncle, in order to enable Smith to collect the proceeds on insurance policies naming Smith as the beneficiary. Connally, Allen, and Coverson were to be paid for committing the offense. The essential evidence offered by the state consisted of the following items:

(1) The judgment of conviction entered against Coverson;

---

**3.** *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), though overruled by *Bruton* on its core holding that limiting instructions *can* be sufficient to obviate confrontation problems, established no *per se* rule that even proper instructions were inevitably sufficient. The determinative inquiry even on the *Delli Paoli* premises was "whether the instructions were sufficiently clear and whether it was reasonably possible for the jury to follow them." *Id.* at 298–99. *See United States v. Bozza,* 365 F.2d 206, 216 (2d Cir. 1966). The instructions found adequate given the surrounding circumstances in *Delli Paoli* were such that the majority could say, "Nothing could have been more clear than these limiting instructions." *Delli Paoli v. United States, supra,* 77 S.Ct. at 299. Obviously, the instructions given in the instant case fall far short of this standard. Because the instructions here were so confusing, we need not decide whether, under the circumstances of this case, it would have been reasonably possible for the jury to have followed proper instructions had they been given. *See id.*

(2) Coverson's confession;

(3) Smith's own confession which fully detailed his own role in the plot and tracked Coverson's confession in all material respects;[4]

(4) A number of applications and policies for life insurance apparently signed by McGee and naming Smith as the beneficiary; uncontradicted evidence of witnesses familiar with the deceased's handwriting to the effect that the deceased's signatures on the applications were forgeries; expert testimony that such signatures were written by petitioner signing deceased's name.

Smith made a vigorous challenge to the voluntariness of his own confession. The jury heard extensive testimony regarding this issue. Taking the stand for the limited purpose of testifying on voluntariness, Smith stated that he had been brought to the police station at approximately 8:00 p. m. and continuously interrogated until he confessed shortly after midnight. According to Smith, the bulk of the interrogation

was conducted in the station house basement, to which he had been moved after a short period of questioning in an "interrogation room" located on the first floor of the station, a floor to which the public had access. Smith testified that once in the basement, and thus out of public view, he was subjected to repeated verbal and physical abuse which continued until he agreed to confess. Smith also testified that his request that he be permitted to call his attorney was denied and that he was not allowed to call his wife.

Smith's account was corroborated in some respects and contradicted in others by the testimony of the police officers connected with the arrest and interrogations. All of the officers testified that Smith had been brought to the station at about 8:00, had been moved from the "interrogation room" to the basement at some point during his interrogation and been interrogated in the basement until Smith confessed at about midnight. Officer Krumnow, who brought Smith down to the basement from the interrogation room, testified that Smith was in the basement from 9:30 to midnight.

**4.** The full text of Smith's confession is as follows:

"My name is Woodrow Wilson Smith. My address is 4202 Hatcher Street, Dallas, Texas. I am 40 years old. On or about November 25, 1963, it was around the time that the (sic) buried the President, John Allen, Willie Coverson, Howard Connally and I all went to Bryan, Texas. We all met at Allen's Cafe, Lagow and Spring Streets around noon. Me and John Allen went in my car which is a 1959 Plymouth, color tan and Willie Coverson and Howard Connally went in Howard Connally's 1955 or 1956 Buick. We all took off from the cafe at the same time and drove out onto Highway 75 and on down to Bryan. We got there sometime around the middle of the evening, about 3:00 pm and we parked somewhere on a side street and then we all got in Howard's car. We directed Howard out to where L. T. McGee lived which was out in the country. Both John Allen and I knew where L. T. McGee lived and as we drove down this country road one of us, either John or I, pointed this house out. I then asked Connally if he could find the house and I think that he said yes. Then we drove on back to Bryan and John Allen and I got back in my car and came on back to Dallas. A few days prior to going to Bryan me and John Allen had discussed an insurance policy that L. T. McGee was carrying

which would have paid off $4,500.00 in the event L. T. was accidentally killed. This policy was carried by the Reliable Life Insurance Company and I had taken it out on L. T. McGee sometime around July, 1962. I had signed the name of Lynn McGee to it as that is the way that the insurance agent had me to sign it. At this time John Allen was in a financial strain and needed some money. He and I agreed that we would dispose of L. T. McGee so we could collect the money on the policy that was made payable to me. We discussed the manner in which it was to be done and all the arrangements were left up to John Allen. John Allen was to pay Howard Connally to kill L. T. McGee and we all four drove to Bryan, Texas for the purpose of setting up the killing. I was going to let John Allen have four or five hundred dollars of the insurance money to get his business strait (sic) in his cafe.

"Two or three days after we had all been to Bryan, Texas I saw Howard Connally at a service station at Corinth and Eighth Streets in Dallas. Howard asked if I had heard anything from that man down in Bryan, meaning L. T. McGee, and I told him that I had, that they had called me and told my wife that he had been murdered.

/s/ Woodrow W. Smith."

Krumnow wanted to talk to Smith in "a quiet place." Each of the four police officers who interrogated Smith in the basement testified that Smith had not been mistreated in his presence; each, however, was present only for some portion of the interrogation. It was undisputed that Smith was not advised of any of his rights until being brought back upstairs to make his confession. None of the officers could give any explanation for the fact that Smith's confession was witnessed by two police officers despite the fact that numerous private citizens, including reporters, were present in the hall just outside the room where Smith made and signed his confession.[5]

Two considerations preclude a finding that the admission of Coverson's confession was harmless error beyond a reasonable doubt. First, it is entirely possible that the jury determined that Smith's confession was involuntary, disregarded it, and convicted Smith on the basis of Coverson's statements which were sufficient to establish every material element of the offense charged against Smith. *See Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). Second, the jury's determination of the *voluntariness* of Smith's confession may have been infected by the admission of Coverson's confession which tended to support the reliability of Smith's confession. *See Jackson v. Denno*, 84 S.Ct. 1774 (1964).

*Schneble, supra,* grew out of a prosecution for murder. The confession of one Snell, Schneble's co-defendant, was admitted into evidence in violation of the *Bruton* rule. Snell's confession included the statement that Schneble had been in the back seat of the car in which Snell, Schneble, and the victim were riding and that Schneble had never left Snell alone with the victim.

The statement tended to undermine Schneble's initial claim that he had left Snell alone with the victim at the time of the murder. The statement also placed Schneble in a position in the car from which he could easily have strangled the victim who had been strangled and then shot. *Id.* at 1058. Just as in the case at bar, the petitioner in *Schneble* had confessed his role in the crime in a minutely detailed confession which he claimed was coerced. *Id.* 92 S.Ct. at 1059.

Justice Rehnquist summarized the evidence against Schneble and set out a framework for harmless error analysis directly relevant to this case.

Not only is the independent evidence of guilt here overwhelming, as in *Harrington* [*Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)] but the allegedly inadmissible statements of Snell *at most tended to corroborate certain details* of petitioner's comprehensive confession. True, under the judge's charge, the jury might have found the confession involuntary and therefore inadmissible. But this argument proves too much; *without Schneble's confession and the resulting discovery of the body, the State's case against Schneble was virtually nonexistent.* The remaining evidence in the case—the disappearance of Mrs. Collier sometime during the trip, *and Snell's statement* that Schneble sat in the back seat of the car during the trip and never left Snell alone with Mrs. Collier—*could not by itself convict Schneble of this or any other crime.* Charged as they were by the judge that they must be "satisfied beyond a reasonable doubt" and "to a moral certainty" of Schneble's guilt before they could convict him, *the jurors could on no rational hypothesis*

---

**5.** In contrast, Coverson's confession was witnessed by one police officer and one member of the local media.

Anticipating *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), by one week, the trial judge held a hearing on the voluntariness of Smith's confession out of the hearing of the jury. At the conclusion of all the testimony hearing on voluntariness, the

court ruled that the confession was voluntary. The testimony was then repeated before the jury prior to admission of the confession. Smith has challenged unsuccessfully the voluntariness of his confession in state habeas proceedings as well as in the district court below. He has not pressed this claim on appeal, however.

*have found Schneble guilty without reliance on his confession.* Judicious application of the harmless-error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face. See *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 504–505, 77 S.Ct. 443, 447, 1 L.Ed.2d 493 (1957).

*Id.* (Emphasis added.)

The contrast to the case at bar is both stark and decisive. Here, Coverson's confession not only corroborated "certain details" of Smith's confession, but sufficed to establish every element of the state's case against Smith. Without Smith's confession, therefore, the state's case against Smith was quite the opposite of "virtually non-existent;" given Coverson's confession, the evidence was fully sufficient to convict Smith. There is indeed a perfectly "rational hypothesis" on which the jury could have found Smith guilty without relying upon his confession.

This analysis is sufficient given the state's evidence in this case to preclude a finding of error harmless beyond a reasonable doubt. Even were this not the case, however, reversal would still be required. For even if we were to assume that the jury did consider Smith's confession, "we must determine on the basis of 'our own reading of the record and on what seems to us to have been the probable impact . . . on the minds of an average jury,' "*Schneble v. Florida, supra,* 92 S.Ct. at 1060, *quoting Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), whether Coverson's admissions were sufficiently prejudicial to petitioner as to require reversal. Here Smith presented a serious and substantial claim that his con-

fession was coerced. As *Jackson v. Denno, supra,* 84 S.Ct. at 1780–88, teaches, an "average jury" has a tendency to confuse the reliability of a confession with its voluntariness. There is a serious danger that the jury may determine that a confession is voluntary *because* it is reliable. An equally serious danger is that the jury will consider a confession it finds involuntary but reliable. *Id.* at 1783–84. Independent evidence going to the defendant's guilt may infect the determination of voluntariness. *Id.* at 1784–85. Here Coverson's confession, corroborating Smith's in virtually every relevant detail, certainly buttressed the apparent reliability of Smith's confession. Indeed, the judge's instructions in this case, instead of arresting the sepsis, may well have promoted its spread. Given the teaching of *Jackson,* we think it undeniable that there was a "reasonable possibility that the improperly admitted evidence contributed to the conviction." *Schneble v. Florida, supra,* 92 S.Ct. at 1060.[6]

For the foregoing reasons, we hold that the introduction of Coverson's unredacted confession under confusing instructions without opportunity for cross-examination deprived Smith of his sixth amendment right of confrontation. Since the error was not harmless beyond a reasonable doubt, we reverse the district court's denial of Smith's application for the writ and direct that the writ be granted subject to the state's right to retry Smith within sixty days.

**REVERSED** and **REMANDED WITH DIRECTIONS.**

---

**6.** Of course, the independent evidence adduced by the state in this case could not support the conviction. Coverson's confession, consequently, was not mere cumulative evidence adding nothing to the state's case which was supported by other overwhelming evidence of guilt. *Cf. Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (evi-

dence overwhelming); *Hall v. Wainwright,* 559 F.2d 964 (5th Cir. 1977) (independent evidence overwhelming; improper confession had no significant impact). *Harrington* does not make the visceral feelings of judges concerning the defendant's guilt the test of harmless error. In *Harrington,* there was overwhelming evidence of guilt, evidence untainted by error.